UNITED STATES of America, Appellee,

v.

AUTOMATED MEDICAL
LABORATORIES, INC.,
Appellant.

No. 84–5152(L).

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1985.

Decided Aug. 15, 1985.

Benton L. Becker, Coral Gables, Fla. (Joseph Ryland Winston, Richmond, Va., Peter A. Collins, on brief) for appellant.

J. Patrick Glynn, Washington, D.C. (Thomas Scarlett, Chief Counsel, Eric M. Blumberg, Associate Chief Counsel, Rockville, Md., for Enforcement, Food & Drug Admin.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Elsie L. Munsell, U.S. Atty., Alexandria, Va., Randy S. Chartash, Washington, D.C., Gregory Welsh, Asst. U.S. Atty., Richmond, Va., on brief) for appellee.

Before ERVIN, CHAPMAN, and SNEEDEN, Circuit Judges.

SNEEDEN, Circuit Judge:

The defendant, Automated Medical Laboratories, Inc. ("AML"), appeals its conviction of one count of conspiracy, in violation of 18 U.S.C. § 371, and three counts of making and using false documents in a matter within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 1001. AML was convicted of these four counts following a jury trial in March 1984 in the United States District Court for the Eastern District of Virginia. AML was fined $250.00 for each count, for a total fine of $1000.00. AML argues that its convictions should be reversed because several instances of prosecutorial misconduct denied it a fundamentally fair trial and because the evidence adduced at trial was insufficient to sustain its convictions. We disagree with these contentions and consequently affirm AML's conviction on all counts.

### I.

On December 12, 1983, a grand jury indicted AML, along with one of its wholly-owned subsidiaries, Richmond Plasma Corporation ("RPC"), and three individuals, Hugo Partucci, Noberto Queris, and Pedro Ramos, for engaging in a conspiracy that included falsification of logbooks and records required to be maintained in connection with the commercial enterprise of producing blood plasma.[1] The indictment alleged that the falsification of logbooks and records was engaged in to conceal from the Food and Drug Administration ("FDA") various violations of federal regulations governing the plasmapheresis process and facilities. The remainder of the eight-count indictment alleged specific violations of the false statements statute, 18 U.S.C. § 1001, with regard to particular logbooks or records at the RPC facility. AML was named as a defendant in six of the seven substantive counts plus the conspiracy count. RPC was found guilty on all counts.

---

1. Plasma, the liquid part of blood in which red cells float, has a number of medically significant properties, both for use within the human body and for use in the manufacture of certain medical products. Plasma is collected through a process called plasmapheresis. This process involves taking whole blood from a donor, separating the plasma from the red blood cells, and returning the red blood cells to the donor. The plasma is then sold to pharmaceutical manufacturers. Donors are to be carefully screened for medical suitability; and there are limits on the amount of blood that may be donated by any one individual based on that individual's weight.

The plasmapheresis process and commercial plasmapheresis facilities are subject to extensive federal regulations. *See Hillsborough County, Florida, et al. v. Automated Medical Laboratories, Inc.,* —— U.S. ——, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Such facilities must register with and be licensed by the FDA. They are also required by Federal regulation to maintain extensive records regarding a variety of matters such as donor screening, equipment testing, and the collection, storage and disposition of plasma. The FDA is authorized to inspect plasmapheresis facilities and their records to ensure compliance with applicable regulations.

The three individuals indicted—Partucci, Queris, and Ramos—were all involved, at various times, in the management or oversight of RPC. Queris was the manager of RPC from 1979 to 1980. In 1980, Ramos succeeded Queris as manager of RPC. Hugo Partucci was a regional manager and "Responsible Head" for several of AML's plasmapheresis facilities between 1972 and 1979. Queris pleaded guilty to one substantive count prior to trial. Ramos was found guilty of one substantive count. Partucci was not present at trial, having apparently left for his native country, Argentina, about six months before the indictment was returned.

AML, a Florida corporation with its main office in Miami, owns and operates several medically-related businesses, such as kidney dialysis centers, facilities for the manufacture and sale of the cancer drug Interferon, and plasmapheresis facilities. AML's primary line of business, however, is the collection and sale of plasma through its eight commercial plasmapheresis centers. Each center, including RPC, is separately incorporated and wholly-owned by AML.

AML had experienced difficulties with RPC dating back to 1977. The FDA closed RPC twice, once in 1977 and again in late 1978, because of problems with overbleeding of donors (removing more blood from a given donor than is allowed by federal regulations) and incomplete recordkeeping. Following the first closing, the manager and responsible head for RPC were changed. Partucci became responsible head for RPC and was charged with assuring compliance with FDA regulations. Partucci, although technically employed by the Orlando Plasma Center, another AML subsidiary, operated as a regional manager for AML and was responsible for assuring compliance with FDA regulations. Partucci was responsible for assuring compliance at RPC and at least two other plasma centers.

At some point, apparently in 1978, Partucci and Edgar Nugent, an Executive Vice President at AML, established a special office for the specific purpose of assuring compliance with federal regulations at AML plasma centers. The compliance office, headed by Partucci, operated from the Orlando Center. By late 1978, the compliance office included Partucci, Claudia Hayes, and Mary Jo Lawton. Another AML employee, Robert Curry, sometimes accompanied them on inspection trips. The members of the compliance "team" conducted periodic inspection at various AML centers to discover and correct any deficiencies in compliance with FDA regulations. Contrary to AML's later characterizations of their responsibilities, the members of the compliance team clearly drew their authority from AML, not from the Orlando Center where their office was located. Thus, they functioned as agents of AML.

The compliance team often conducted inspections in advance of FDA inspections. Some of the deficiencies, particularly at RPC, were severe enough, however, that the compliance team members began to instruct plasma center employees to falsify and fabricate records to conceal these deficiencies—a practice apparently engaged in on the basis of Partucci's instructions. During the time that RPC was closed in late 1978 and early 1979, the compliance team, sometimes with Queris and Curry, visited RPC to prepare for the FDA inspection prior to its reopening. Faced with numerous problems, the compliance team, Queris, and Curry instructed RPC employees to falsify various records or falsified the records themselves.

Partucci left AML in December of 1979; but, even after his departure, the practice of falsifying records continued. Several RPC employees testified at trial that they were instructed by the compliance team, Queris, or Curry to falsify various records, including whole blood weight logs (in which false entries regarding the number of overbleeds in a given day were recorded); quality control logs (in which false entries for quality control tests of equipment were made when such test had not been conducted); autoclave logs (in which false entries were made showing sterilization of materi-

als and destruction of infectious plasma by autoclaving when such autoclaving had not occurred); and various other records including donor records and plasma storage freezer temperature charts.

After Partucci's departure, members of the compliance team began to report to Mili Lamas, a vice-president at AML. Sometime in March or April of 1980, Queris informed Lamas of the entire history of unlawful practices at RPC.[2] In mid-March 1980, Lois Keith, an AML employee, travelled from the Miami office to the RPC offices, where she discovered a whole blood weight log that had been falsified. Keith telephoned Lamas to inform Lamas of her discovery. Several days later, Lamas met with Keith, Lawton, and Hayes to discuss the falsification of the weight log. Lamas informed them that AML's attorney would notify the FDA of the problem. Unbeknownst to Lamas, however, or anyone else at AML or RPC, several RPC employees had gone to the FDA in mid-March 1980 to report the long-standing and pervasive falsification practices at RPC.

The FDA began an inspection of RPC in March of 1980. By the end of that March, an initial FDA inspection report had been prepared. The investigation was concluded by June of 1980 and a final report prepared by October 1980. From that point until March 1982, various levels of the FDA reviewed what had been recommended. In March of 1982, the FDA referred the matter to the Department of Justice recommending criminal prosecution. The Department of Justice referred it to the U.S. Attorney's office in Richmond in mid-March 1982. An indictment was returned by the grand jury on December 12, 1983. An eight-day jury trial was held in March 1984 resulting in the conviction of AML on four of seven counts.

## II.

AML alleges that the following instances of prosecutorial misconduct denied AML a fundamentally fair trial:

(1) that pre-indictment delay by the Government substantially prejudiced AML's ability to present a defense;

(2) that the Government did not fully respond to AML's request for a bill of particulars; and

(3) that Government counsel engaged in improper questioning of witnesses at trial.

We shall briefly address each of these allegations of prosecutorial misconduct.

### A. Pre-indictment Delay and Prejudice

AML emphasizes that approximately 45 months elapsed from the time the FDA completed its initial investigative report in March 1980 to the time that the grand jury indicted AML in December 1983. During that period of time, Partucci left for Argentina. AML claims that it has been substantially prejudiced in presenting a defense because of the loss of Partucci's testimony. AML asserts that Partucci would have testified that no officer or director of AML participated in, had knowledge of, or directed the unlawful practices at RPC; that Partucci intentionally concealed such practices from AML; and that Partucci engaged in these practices for his benefit.

The district court, although indicating that it thought the delay was unreasonable and prejudicial, decided not to rule prior to trial on AML's motion to dismiss the indictment. App.Vol. III at 931. Following the trial, the district court declined to overturn the jury's verdict, apparently concluding, among other things, that AML had not been denied its right to a fair trial. App. Vol. VI at 2502–03 and 2510. We agree that AML has not been denied its right to due process.

The seminal cases regarding when pre-indictment delay deprives a defendant of due process are *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468

---

**2.** It is somewhat unclear exactly when Lamas learned of the unlawful practices at RPC. Robert Curry, for example, testified that he in-

formed Lamas of these practices sometime in late 1979. App.Vol. V at 1978.

(1971), and *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In *Marion*, the Court found that a 38-month delay between the end of the criminal scheme charged and the time of the indictment did not violate defendants' right to due process. The defendants, asserting no specific prejudice other than that which might potentially result from the passage of time, argued that the delay violated their right to a speedy trial under the Sixth Amendment and their right to due process under the Fifth Amendment. The Supreme Court first held that the Sixth Amendment Speedy Trial provision has no application until a defendant becomes an "accused", which occurred in that case when the defendants were indicted. 404 U.S. at 313, 92 S.Ct. at 459. The Court went on to emphasize that the primary guarantee against the bringing of overly stale charges is the applicable statute of limitations. *Id.* at 322, 92 S.Ct. at 464.[3] The Court pointed out, however, that a statute of limitations does not fully define the rights of a defendant with respect to events prior to indictment and confirmed that the Due Process Clause of the Fifth Amendment has a role to play. The Court noted the concession of the Government that the Fifth Amendment "would require dismissal if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. at 465. The Court declined to elaborate further regarding the circumstances under which a showing of actual prejudice would require dismissal of an indictment, stressing that such a determination would involve an assessment of the facts in each case. Finding that the defendants had neither alleged nor proved *actual* prejudice and that there was no showing that the Government had intentionally delayed for tactical advantage, the Court held that the defendants had not adequately demonstrated that the Government had violated due process.

In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), which involved a 17-month delay during which two witnesses died, the Supreme Court elaborated on the requirement of a showing of actual prejudice set forth in *Marion*. The Court, reversing the lower court's dismissal of the indictment, stated that while proof of actual prejudice makes a due process claim concrete and ripe for adjudication, it does not automatically make the claim valid. *Id.* at 789, 97 S.Ct. at 2048. In evaluating a due process claim, the Court directed that consideration be given to "the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. at 2049. The Court noted the Government's further concession, going beyond its "tactical delay" concession in *Marion*, that a due process violation might also be found on a showing of "prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Id.* at 795, n. 17, 97 S.Ct. at 2051, n. 17, *quoting* Brief for United States at 32–35. Finding that the Government had been engaged in a good-faith continuing investigation, the Court held that "to prosecute a defendant following *investigative* delay does not deprive him of due process, even if his defense might have been prejudiced somewhat by the lapse of time." *Id.* at 796, 97 S.Ct. at 2052 (emphasis added).

■ The Supreme Court's decisions in *Marion* and *Lovasco* may be read as establishing a two-pronged inquiry when pre-indictment delay is alleged to violate due process. First, a court must assess whether the defendant has suffered actual prejudice, and the burden of proving such prejudice is clearly on the defendant. If the threshold requirement of actual prejudice is met, the court must then consider the

---

**3.** The applicable statute of limitations for the offenses of which AML was convicted is five years. 18 U.S.C. § 3282.

Government's reasons for the delay, balancing the prejudice to the defendant with the Government's justification for delay. *United States v. Townley*, 665 F.2d 579, 582 (5th Cir.1982), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). The basic inquiry then becomes whether the Government's action in prosecuting after substantial delay violates "fundamental conceptions of justice" or "the community's sense of fair play and decency." *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977).

■ Applying this two-pronged analysis in the case before us, we find that AML was prejudiced only slightly, if at all, by the loss of Hugo Partucci's testimony. First, there is no showing that Partucci would have waived his Fifth Amendment right and have testified at the trial. Second, the content of Partucci's testimony remains highly speculative. AML contends that his testimony would have aided the defense in that he would have testified that no officer or director of AML directed him to violate the law, but that remains far from clear. According to the testimony of Mili Lamas at a pre-trial hearing, Partucci told Lamas in 1983 that he had never received an order from AML to do anything unlawful, but he also told her that he had done nothing wrong at RPC. In light of his statement to Lamas, it seems just as possible that Partucci's testimony might have been inculpatory of AML rather than exculpatory—that he might have continued to deny his wrongdoing and have attempted to place the blame on AML. Finally even assuming that Partucci would have testified as AML contends that he would, his testimony could not have significantly aided AML. Even if Partucci had testified that no officer or director directed him to engage in unlawful practices, such testimony would not have exonerated AML because AML's conviction was based not on the actions of its officers or directors but on the fact that its corporate agents, acting within the scope of their authority, committed criminal acts for which AML is liable as a matter of law.

■ Assuming some slight prejudice to AML, it seems clear that there is no violation of due process when the Government's reasons for the delay are considered. The government contends that the delay was justified by the lengthy administrative review process at the FDA which is not necessarily geared toward a criminal investigation, by the time required for Government attorneys to become familiar with a complex case involving a federal regulatory scheme, and by manpower problems in the United States Attorney's office in Richmond. The Government also argues, and we agree, that at least a portion of the delay was attributable to additional investigative activities required when the case actually reached Government prosecutors at the Department of Justice and the U.S. Attorney's Office. While such reasons may not suffice where the actual prejudice to the defendant from the delay is substantial, we find that there is no due process violation when these reasons are considered in light of the slight, possibly nonexistent, prejudice suffered by AML. While the Government could possibly have acted with more dispatch in this case, we do not believe that any portion of the delay was occasioned by deliberate or bad faith acts or omissions on the part of Government employees or prosecutors. The wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace, but careful investigation and consideration prior to the bringing of criminal charges is generally a wise policy. Certainly there is no indication that the Government intentionally delayed to gain some tactical advantage, *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971), or even that the delay was incurred in "reckless disregard of circumstances ... suggesting that the delay would impair the ability to mount an effective defense." *United States v. Lovasco*, 431 U.S. 783, 795 n. 17, 97 S.Ct. 2044, 2051 n. 17, 52 L.Ed.2d 752 (1977). Consequently, we find that AML has suffered no violation of its due process rights

because of prosecutorial delay prior to indictment.

### B. Bill of Particulars

AML next alleges that the Government did not adequately respond to AML's motion for a bill of particulars. In its motion, AML requested detailed information, regarding a variety of matters, including which particular entries on which documents were alleged to be false. App.Vol. I at 29–37. At a pretrial hearing on March 6, 1984, the Government represented to the district court that it could not provide such information because, although its witnesses would testify to the fact that they made false entries, they would not now be able to testify as to which specific entries were false and which were true. The Government explained that its case involved a pattern and practice of falsifications over a long period of years and that its proof would not be limited to selected entries or specific dates.

The court indicated its understanding of the situation and went on to explain the problem to defense counsel. Without formally ruling on the motion for a bill of particulars, the court instructed the Government to provide AML with such information wherever it *could* do so. App. Vol. III, 974. For example, the Government had stated that in one instance, where it had an original log book and a recopied version, it could possibly identify false entries by comparing the two.

Following this hearing, the Government sent to all defense counsel a letter dated March 9, 1984, regarding the evidence to be offered with respect to each logbook or other document. App.Vol. I at 216–218. The letter generally described the type of evidence regarding each log and indicated the page numbers that the government intended to highlight at trial. The letter also stated that various witnesses would identify their own initials and handwriting on the logbooks and documents. In certain instances, this would indicate a false entry to the extent that the person initialing the entry might not have actually witnessed the event being recorded or that one person's initials might have been forged by another. It would not necessarily indicate that the underlying entry was false. Prior to sending this letter, the government had also provided AML with a copy of the logbook or document pertaining to each substantive count and made available for inspection or copying all documents related to the conspiracy count.

 AML argues that, at trial, numerous Government witnesses, contrary to the Government's representation, did testify as to which specific entries were false. The Government responds that its witnesses, as explained prior to trial in the March 9 letter, identified their initials or handwriting and that such identification would sometimes indicate a false entry. The Government's description of the testimony at trial appears to be a fair characterization of that testimony. While the Government could possibly have provided even more specifics, it seems clear that the Government provided sufficient detail to satisfy the purpose of a bill of particulars, which is to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial. *United States v. Schembari*, 484 F.2d 931 (4th Cir.1973). A bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial. *United States v. Anderson*, 481 F.2d 685 (4th Cir.1973), *aff'd on other grounds*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). We do not find AML's due process rights to have been violated by the Government's response to AML's bill of particulars.

### C. Improper Questioning of Witnesses

 AML alleges misconduct by the Government in that the Government failed to elicit and, in fact, suppressed testimony favorable to AML in its examination of Norberto Queris. AML, however, was able to bring out the favorable information on cross-examination. A second instance of alleged misconduct was that the Government, in examining an RPC employee, im-

plied that a letter firing that employee had been written by AML Vice-President Lamas, rather than by AML's general counsel. The district court, however, gave an instruction that corrected any impression on the part of the jury that Lamas had authored the letter firing the employee. We find no misconduct by the Government in its questioning of these witnesses, and we find no violation of AML's due process rights.

## III.

█ AML's final argument is that there is insufficient evidence to support its conviction, and thus the district court should have granted AML's motion for a judgment of acquittal. AML asserts that there is no evidence that any officer or director at AML knowingly and willfully participated in or authorized the unlawful practices at RPC, essentially arguing that the Government failed to prove that AML had the requisite intent to violate 18 U.S.C. § 1001.[4] AML further maintains that the Government failed to prove the "element" that its agents' criminal acts were undertaken primarily to benefit AML.

In *United States v. Basic Construction Co.*, 711 F.2d 570 (4th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), this Court rejected the argument that the Government had to prove "that the corporation, presumably as represented by its upper level officers and managers, had an intent separate from that of its lower level employees to violate the antitrust laws." *Id.* at 573. *Basic Construction* involved a criminal prosecution under section 1 of the Sherman Act, 15 U.S.C. § 1, for bid rigging in state road paving contracts. The conviction of Basic Construction Company, affirmed by the Court, was based on evidence showing that the bid rigging activities were perpetrated by two relatively minor officials and were done without the knowledge of high level corporate officers. Basic introduced evidence indicating that it had a longstanding, well known, and strictly enforced policy against bid rigging. The Court, citing with approval several cases from other circuits, summarized the rule on corporate criminal liability as follows:

> These cases hold that a corporation may be held criminally responsible for antitrust violations committed by its employees if they were acting within the scope of their authority, or apparent authority, and for the benefit of the corporation even if ... such acts were against corporate policy or express instructions.

*Id.* at 573.[5] Thus, AML may be held criminally liable for the unlawful practices at RPC if its agents were acting within the scope of their employment, which includes a determination of whether the agents were acting for the benefit of the corporation. *See United States v. Cincotta,* 689 F.2d 238, 242 (1st Cir.), *cert. denied,* 459

---

**4.** Section 1001 provides the following:

> *§ 1001—Statements or entries generally*
> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**5.** We believe that *Basic Construction* states a generally applicable rule on corporate criminal liability despite the fact that it addresses violations of the antitrust laws. There are equally valid reasons for holding a corporation liable for violations of regulatory requirements, particularly when those requirements pertain to public health and safety, as there are for holding corporations responsible for antitrust violations. The rule set forth in *Basic Construction* is also consistent with the following general rule described in *Old Monastery Co. v. United States:*

> A corporation may be held criminally responsible for acts committed by its agents, provided such acts were committed within the scope of the agents' authority or course of their employment.

147 F.2d 905, 908 (4th Cir.), *cert. denied,* 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437 (1945). Moreover, corporations have been held liable for acts of their agents in violation of 18 U.S.C. § 1001. *United States v. Cincotta,* 689 F.2d 238 (1st Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982).

U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982).

The term "scope of employment" has been broadly defined to include acts on the corporation's behalf in performance of the agent's general line of work. *United States v. Hilton Hotels Corporation,* 467 F.2d 1000, 1004 (9th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). To be acting within the scope of his employment, an agent must be "performing acts of the kind which he is authorized to perform, and those acts must be motivated—at least in part—by an intent to benefit the corporation." *United States v. Cincotta, supra* at 241–42. It is clear that the agents of AML—Partucci, Lawton, Hayes, and Curry—were acting within the scope of their employment. AML had specifically assigned to these individuals the responsibility for assuring compliance by its plasmapheresis centers with FDA regulations. In instructing other employees regarding compliance with applicable regulations, Partucci and the others were acting within the scope of their authority or certainly within their apparent authority. The fact that many of their actions were unlawful and contrary to corporate policy does not absolve AML of legal responsibility for their acts. *United States v. Basic Construction Co.,* 711 F.2d 570 (4th Cir.1983).

Moreover, it would seem clear that Partucci and the other members of the compliance team acted at least in part to benefit AML. In *Old Monastery Company v. United States,* 147 F.2d 905 (4th Cir.), *cert. denied,* 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437 (1945), this Court clarified that it is not necessary for an agent's actions to have actually benefited the corporate entity. Noting that the Government's case had shown that the agent's acts were potentially *detrimental* to the corporation, the Court stated that benefit is not a "touchstone of criminal corporate liability; benefit at best is an evidential, not an operative, fact." *Id.* at 908. Thus, whether the

agent's actions ultimately redounded to the benefit of the corporation is less significant than whether the agent acted with the intent to benefit the corporation. The basic purpose of requiring that an agent have acted with the intent to benefit the corporation, however, is to insulate the corporation from criminal liability for actions of its agents which be *inimical* to the interests of the corporation or which may have been undertaken solely to advance the interests of that agent or of a party other than the corporation. *See Standard Oil Company of Texas v. United States,* 307 F.2d 120 (5th Cir.1962); *See also* W. LaFave and A. Scott, Jr., Criminal Law § 33 (1972). It would seem entirely possible, therefore, for an agent to have acted for his own benefit while also acting for the benefit of the corporation.

In light of the foregoing principles, we believe that the jury could reasonably have concluded from the evidence presented at trial that Partucci and other agents of AML acted, at least in part, with the intent of benefiting AML by their unlawful acts. AML attempts to make much of the testimony regarding Partucci's ambitious nature and his desire to ascend the corporate ladder at AML, arguing that he instigated the unlawful practices at RPC to benefit himself, not AML. We are not persuaded by this argument. Partucci was clearly acting in part to benefit AML since his advancement within the corporation depended on AML's well-being and its lack of difficulties with the FDA. At any rate, regardless of Partucci's motivation, the other members of the compliance team appear to have been acting for the benefit of AML.[6]

When viewed in light of the proper principles governing corporate criminal liability, the evidence presented at trial is more than sufficient to sustain AML's conviction on all counts. It is well-established that a jury verdict must be affirmed if there is

---

**6.** AML was also aided by a very favorable instruction from the district court regarding benefit to the corporation. Judge Warriner instructed the jury that the acts undertaken by the agent

must have been "for the purpose *primarily* of benefiting the corporation." App.Vol. VI at 2448 (emphasis added).

sufficient evidence, viewed in the light most favorable to the Government, from which a rational jury could have found guilt beyond reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lawson,* 682 F.2d 480, 482 n. 5 (4th Cir.1982) *cert. denied,* 459 U.S. 991, 103 S.Ct. 348, 74 L.Ed.2d 387 (1982). Numerous Government witnesses testified regarding the unlawful actions of and instructions given by Partucci, Lawton, Hayes, and Curry—all agents of AML. Based on our review of the record, we find that there was sufficient evidence to support the jury's verdict. The conviction of AML is

AFFIRMED.