**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                  No. 99-4271

THEODORE DIZELOS,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams Jr., District Judge.
(CR-98-63-AW)

Argued: May 2, 2000

Decided:  July 19, 2000

Before WILKINSON, Chief Judge, and WILLIAMS
and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Green-
belt, Maryland, for Appellant. Steven Michael Dettelbach, Assistant
United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** Lynne A. Battaglia, United States Attorney, Greenbelt,
Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Defendant Theodore Dizelos appeals his convictions and sentence for owning and operating an automobile "chop-shop," see 18 U.S.C.A. § 2322 (West Supp. 2000), knowingly tampering with or removing vehicle identification numbers ("VINs"), see 18 U.S.C.A. § 511(a)(1) (West 2000), possessing with the intent to sell a vehicle knowing that the VIN had been removed or altered, see 18 U.S.C.A. § 2321 (West Supp. 2000), and conspiracy to commit these crimes, see 18 U.S.C.A. § 371 (West 2000). We affirm.

I.

The evidence at trial, viewed in the light most favorable to the Government, see United States v. Burgos, 94 F.3d 849, 854 (4th Cir. 1996) (en banc), revealed the following facts. In early June 1995, John Smale purchased a 1995 Chevrolet Geo Prism, champagne in color, to replace his 1995 Chevrolet Geo Prism, green in color, which had been stolen in April. Noticing that his "new" Prism had characteristics very similar to his stolen vehicle, including for example a chink in the windshield, Smale had the vehicle inspected and learned that he had, in fact, repurchased his own vehicle. The vehicle had been "replated" with a VIN from a wrecked vehicle sold at auction.

Police officers began an investigation, which led them to Dizelos and his business, Rockville Autosales T/A Beltsville Motors. A June 21, 1995 search of Dizelos' home and business uncovered stolen vehicles, vehicle parts from stolen vehicles, numerous loose VINs which had been removed from stolen cars (including the VIN plate from Smale's vehicle), anti-theft "clubs," car radios, and various personal effects from stolen cars, as well as owner's manuals, titles, and business documents corresponding to recently stolen vehicles. In Dizelos' home driveway, police recovered three recently stolen vehi-

2

cles with the VINs at various stages of removal and, in his garage, another stolen car with a punched out ignition and screwdriver in the front seat. During the search of the home, Dizelos' wife drove up in yet another stolen vehicle.

Armed with this information, police contacted area automobile dealerships and obtained records for vehicles which Dizelos and his employees had sold to them during the previous year, obtained title histories, and began locating the current owners of vehicles that could be linked to Dizelos' business. Each vehicle with a VIN that had been switched, altered, or removed was inspected by a law enforcement officer and, through the use of confidential VINs, was identified by its true VIN.

In summary, Dizelos was operating a "chop-shop" and "replating" business. Dizelos' employees removed the VINs from stolen cars brought to Dizelos and replaced them with those of wrecked vehicles which Dizelos or his coconspirators bought at area auctions. The vehicles were then sold to innocent Maryland and Virginia auto dealers, which in turn sold them to innocent purchasers. During their investigation, police linked over 60 stolen cars to Dizelos and his business.

Dizelos was subsequently indicted by the grand jury on one count of owning and operating an automobile chop-shop, see 18 U.S.C.A. § 2322, two counts of knowingly tampering with or removing VINs, see 18 U.S.C.A. § 511(a)(1), one count of possessing with the intent to sell a vehicle knowing that the VIN had been removed or altered, see 18 U.S.C.A. § 2321, and one count of conspiracy to commit these crimes, see 18 U.S.C.A. § 371. Following a jury trial, Dizelos was convicted on all counts. His ensuing motion for a new trial was denied, and he was sentenced to a total of 64 months imprisonment, three years of supervised release, and restitution in the amount of $978,130.95.

II.

A.

We first address Dizelos' contention that the district court erred in denying his motion to reopen the testimony or grant a continuance

3

and, after conviction, in denying his motion for a new trial to allow Dizelos to present the statement of an additional witness, Kevin Tong. We find no error.

During the trial, Dizelos asserted that the chop-shop was being operated by independent salesmen and others who had rented space from him and that he had no knowledge of the illegal activity taking place on his business premises. On Friday, November 6, 1998, the defense rested its case, leaving only closing arguments and jury instructions to be completed. Over the weekend, Dizelos claimed that a man named Kevin Tong contacted him after seeing a televison report on the trial. Tong told Dizelos that he believed the wrong man was being prosecuted and agreed to meet with Dizelos' counsel and a defense investigator that weekend.

On Monday, November 9, Dizelos' counsel moved to reopen the testimony, not to present Tong's testimony, but rather to present the testimony of the defense investigator as to what Tong had told him during their interview. Dizelos' counsel had not served Tong with a subpoena and Tong was not voluntarily present in court. Additionally, Dizelos' counsel represented that Tong had advised them that he would not appear in court even if subpoenaed. Hence, Dizelos sought to reopen the case to call the investigator to testify as to what Tong had told them during the weekend interview. Specifically, Dizelos' counsel represented that Tong had told the investigator that he had assisted in bringing stolen cars to Dizelos' business, but that he had never dealt with Dizelos personally and that, instead, a man named "John" had told him not to come by the shop if he saw the "Greek guy." J.A. 29, 88. Because Tong had been told not to deal with the "Greek guy," Tong believed that Dizelos must not have been involved in the car-stealing and chop-shop scheme. As an alternative to the investigator's testimony, Dizelos sought a continuance to allow the parties to attempt to relocate and subpoena Tong. The district court denied both motions.

Over four months after his conviction, but before Dizelos was sentenced, Dizelos' new counsel filed a motion for a new trial based upon the same grounds. This time, Tong had been served with a subpoena to appear at Dizelos' sentencing hearing, but made good on his earlier promise not to appear. Instead, Dizelos presented affidavits of

4

his prior and current counsel concerning the substance of the testimony that Tong would have allegedly offered. The Government, having also located Tong in the interim, submitted two statements of investigating FBI agents which contradicted those of Dizelos' counsel. According to these statements, Tong had denied any involvement in stealing cars, did not understand why Dizelos' counsel was trying to involve him in the matter, and stated that, as far as Tong knew, Dizelos "was running the show" and was "the boss" at Beltsville Motors. J.A. 51. The district court denied Dizelos' motion for a new trial.

1.

We first conclude that the district court did not abuse its discretion in denying Dizelos' motion for a new trial based upon the proffered testimony. See United States v. Dorlouis, 107 F.3d 248, 254 (4th Cir. 1997). A motion for a new trial must be made within "7 days after the verdict or finding of guilty," unless based upon newly discovered evidence, in which case the motion may be made within three years after final judgment. Fed. R. Crim. P. 33. In determining whether the district court abused its discretion in denying a motion for a new trial based upon newly discovered evidence, we apply the following test:

> (i) is the evidence, in fact, newly discovered; (ii) are facts alleged from which the court may infer due diligence on the part of the movant; (iii) is the evidence relied upon not merely cumulative or impeaching; (iv) is the evidence material to the issues involved; and (v) would the evidence probably result in acquittal at a new trial?

United States v. Christy, 3 F.3d 765, 768 (4th Cir. 1993) (quoting United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989)).

Although the identity of Kevin Tong was known prior to the conclusion of Dizelos' trial, Dizelos did not file his motion for a new trial until more than four months after his conviction. Dizelos acknowledges, as he must, that the motion was not filed within the requisite seven-day time limit, but asserts that the district court nevertheless erred in denying his motion because it was based upon newly discovered evidence. The district court, however, denied Dizelos' motion for

5

a new trial because the request was untimely and was not based upon "newly discovered" evidence. Additionally, the court found that the evidence was of questionable admissibility and, even if admitted, would have made no difference in the outcome of the trial. We agree.

First, we reject Dizelos' assertion that the evidence was "newly discovered" because, although Tong had come forward and Dizelos knew the general substance of Tong's statement prior to the guilty verdict, the statement had not been "fully developed" within the seven days following the guilty verdict. Dizelos' counsel had met with Tong in person prior to the conviction and, to the extent the information needed development, Rule 33 allows a defendant to request an extension of the seven-day deadline in order to develop such evidence. See Fed. R. Crim. P. 33 ("A motion for a new trial based on any other grounds may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period."). Such a request was never made in this case.

Second, the district court, although acknowledging that Tong's statement could be construed as a statement against his penal interest under Rule 804(b)(3) of the Federal Rules of Evidence, did not abuse its discretion in concluding that the proffered testimony lacked sufficient indices of reliability to be admissible under either the penal interest exception of Rule 804(b)(3) or the residual hearsay exception of Rule 807. See Fed. R. Evid. 804(b)(3) (providing that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement" (emphasis added)); Fed. R. Evid. 807 (providing that under certain circumstances, a statement not specifically covered by a specific hearsay exception "but having equivalent circumstantial guarantees of trustworthiness" may be admitted). As noted by the district court, Tong refused to come to court to offer the purported exculpatory testimony, despite being under subpoena. The alleged statement to the defense investigator was vague, speculative, and subject to various slants, spins, and conflicting inferences. There was evidence that just prior to the sentencing hearing, Tong had wholly denied making the alleged statement. And, in addition to the fact that Dizelos was the sole owner and operator of the business from which the chop-shop primarily operated, overwhelming evidence had been seized during

6

the search, particularly that found at Dizelos' home, which revealed that Dizelos was not only involved, but was leading the chop-shop operation.

In the end, Dizelos' proffered "new" testimony was that of a defense investigator to the effect that Tong told him that he believed, based upon yet another hearsay statement of one of Dizelos' employees, that Dizelos was not involved in the chop-shop operation because Tong had been told not to deal directly with Dizelos. Under the circumstances, we cannot say that the district court erred in finding that the evidence was unreliable and that, in any event, admission of the conflicting hearsay statements would not have resulted in an acquittal at a new trial.

2.

For similar reasons, we reject Dizelos' appeal of the district court's denial of his motion to either reopen the case to permit him to present additional testimony or to continue the case to allow the parties an opportunity to find Tong. The denial of a motion to reopen a case is a decision which also rests within the district court's sound discretion. See United States v. Abbas, 74 F.3d 506, 510 (4th Cir. 1996). In determining whether this discretion has been abused,"we examine (1) whether [the defendant] provided a reasonable explanation for failing to present the evidence in [his] case-in-chief; (2) whether the evidence was relevant, admissible, or helpful to the jury; and (3) whether reopening the case would have infused the evidence with distorted importance, prejudiced the opposing party's case, or precluded the opposing party from meeting the evidence." Id. at 511. We review the district court's denial of Dizelos' motion for a continuance for an abuse of discretion as well. See United States v. Speed, 53 F.3d 643, 644 (4th Cir. 1995).

The district judge denied Dizelos' motion to reopen his case or for a continuance, made just prior to closing arguments. Noting that the investigator's proffered testimony would consist of the hearsay statements of Tong, and of an additional person to Tong concerning Dizelos' involvement, the district court concluded that the testimony was vague, speculative, of questionable probative value, and wholly uncorroborated. The district court also found no reason for a continu-

7

ance of the case to allow the parties to find Tong. Tong had refused to come forward voluntarily and had told defense counsel that he would refuse to obey a subpoena. Additionally, defense counsel indicated that Tong would likely invoke his Fifth Amendment right not to incriminate himself and, therefore, refuse to testify even if he did appear. And, of course, reopening the case to present the investigator's statement "would have infused the evidence with distorted importance, prejudiced the [Government's] case, [and] precluded the [Government] from meeting the evidence." Abbas, 74 F.3d at 511. Accordingly, we conclude that the district court did not abuse its discretion in denying Dizelos' motion to reopen the testimony or, in the alternative, for a continuance.

B.

Dizelos next contends that the Government's thirty-two month delay between the June 1995 search of his home and business and his February 1998 indictment violated his due process rights under the Fifth Amendment. See United States v. Marion, 404 U.S. 307 (1971); United States v. Lovasco, 431 U.S. 783 (1977). To determine whether a preindictment delay violates a defendant's due process rights, we examine (1) whether the defendant has demonstrated actual prejudice from the delay, and (2) if so, whether the government's reasons for the delay justify the prejudice to the defendant. See United States v. Automated Med. Lab., Inc., 770 F.2d 399, 403-04 (4th Cir. 1985). "The basic inquiry then becomes whether the [g]overnment's action in prosecuting after substantial delay violates `fundamental conceptions of justice' or `the community's sense of fair play and decency.'" Id. at 404 (quoting Lovasco, 431 U.S. at 790). Thus, for example, due process "would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to [defendant's] right to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." Marion, 404 U.S. at 324. We will not reverse a district court's denial of a motion to dismiss for preindictment delay unless its findings are clearly erroneous. See United States v. Burns , 990 F.2d 1426, 1435 (4th Cir. 1993).

Dizelos admits that there is no evidence of intentional delay on the part of the Government to gain a tactical advantage. Rather, he asserts

8

that the Government's reasons for the delay do not justify the prejudice he has allegedly suffered. Specifically, Dizelos complains because law enforcement officials, after inspecting and photographing the stolen vehicles, released the vehicles back to the rightful owners rendering it difficult, if not impossible, for Dizelos to inspect the vehicles.

First, the district court's finding that Dizelos had failed to demonstrate actual prejudice is not clearly erroneous. Dizelos' burden, to "show . . . actual substantial prejudice," Jones v. Angelone, 94 F.3d 900, 905 (4th Cir. 1996), was a heavy one. Although he did not have access to the replated vehicles in this case, the unavailability was not the result of the delay in the indictment. Once the stolen vehicles were identified and photographed by the law enforcement officers, they were returned to their rightful owners as soon as possible. Dizelos essentially conceded to the district court that he could not identify what, if anything, he could have discovered had he had the opportunity to inspect the vehicles, offering little more than a speculative assertion that he may have discovered that they had not been replated at all. However, such "potential prejudice and the passage of time" are not sufficient to establish a due process claim based upon pre-indictment delay, Marion, 404 U.S. at 323; see also Jones, 94 F.3d at 906, nor is an asserted general deficiency in developing a potential defense, see Automated, 770 F.2d at 403. Accordingly, we conclude that the district court did not err in deciding that Dizelos' showing was insufficient to meet the heavy burden of demonstrating actual, substantial prejudice from preindictment delay.

Second, after the search warrants were executed, law enforcement officers proceeded to link the myriad stolen cars, car parts, and personal property to their rightful owners, and to contact area dealerships which had purchased the chop-shop vehicles. Title histories and other documentary evidence required exploration and time was needed to inspect the vehicles and to interview the witnesses. Further complicating matters was the fact that, in addition to there being three separate prosecutors involved in handling the case, Dizelos was represented by four separate defense attorneys at various times during the investigatory process who were engaged in preindictment discussions with the Government. And, these discussions, of course, included efforts on the part of Dizelos' counsel to persuade the Government to delay or

9

forgo indictment altogether. Accordingly, the district court also did not err in concluding that the delay, although lengthy, was not an unreasonable or unjustified one due to the complexity of the case, the extensive nature of the investigation, the number of counsel involved, and the ongoing negotiations regarding pleas and whether an indictment would be necessary. See Lovasco, 431 U.S. at 796 (holding that prosecution of a defendant after a good-faith continuing investigation "does not deprive [defendant] of due process, even if his defense might have been somewhat prejudiced by the lapse of time").

C.

Dizelos next asserts that the district court erred in failing to instruct the jury that willfulness is an essential element of a violation of 18 U.S.C.A. § 511(a)(1), and one required by the due process clause of the Fifth Amendment. We review the district court's refusal to give a requested jury instruction for an abuse of discretion. See United States v. Romer, 148 F.3d 359, 367 (4th Cir. 1998), cert. denied, 525 U.S. 1141 (1999).

Section 511(a)(1) makes it unlawful for a person to knowingly remove or alter VIN plates:

> (a) A person who --
>
> (1) knowingly removes, obliterates, tampers with, or alters an identification number for a motor vehicle or motor vehicle part . . . .
>
> . . . .
>
> shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C.A. § 511(a)(1). Dizelos requested that the jury also be instructed that, in order to convict, it must find that Dizelos acted "with knowledge that [his] conduct [was] unlawful and with intent to do something the law forbids. That is to say, with a bad purpose to disobey or disregard the law." J.A. 107. The district court refused.

10

In <u>United States v. Chorman</u>, 910 F.2d 102 (4th Cir. 1990), this court specifically recognized that, while § 511(a)(1) requires that a person "knowingly" remove, obliterate, tamper with or alter the VIN to be convicted, "`[k]nowingly' in this context means only `knowing action' by the defendant." <u>Id.</u> at 110 (citing <u>United States v. Enochs</u>, 857 F.2d 491, 492 (8th Cir. 1998) (holding that"section 511(a) does not require that the defendant act with specific intent" to violate the law)); <u>see also United States v. Wilson</u>, 133 F.3d 251, 262 (4th Cir. 1997) (en banc) (holding that the Clean Water Act's"knowing" mens rea requires only that the defendant know the facts that make his conduct illegal, not that he know that his conduct was illegal). The district court properly instructed the jury as to § 511(a)'s "knowing" requirement and, accordingly, did not err in refusing Dizelos' request that the jury be provided with the proposed additional instruction that it must find that Dizelos acted with specific intent or a purpose to disobey the law.

III.

We turn now to Dizelos' challenges to his sentence. Specifically, Dizelos asserts that the district court erred in calculating the loss attributable to him under the sentencing guidelines, <u>see</u> U.S. Sentencing Guidelines ("U.S.S.G.") Manual § 2F1.1 (1998), and in finding that he was an "organizer or leader" of an"otherwise extensive" criminal activity, <u>see</u> U.S.S.G. § 3B1.1(a). We address these contentions in turn.

A.

Dizelos' first challenge to his sentence centers on his assertion that the trial court erred in imposing an eleven-level increase in his base offense level pursuant to U.S.S.G. § 2F1.1. Section 2F1.1(b)(1)(L) provides for an eleven-level increase in the base offense level of six for offenses involving fraud or deceit if the loss exceeds $800,000. Generally, valuation of loss in the case of theft is determined by the fair market "value of the money, property, or services unlawfully taken." U.S.S.G. §§ 2F1.1, comment. (n.8),§ 2B1.1, comment. (n.2). In calculating the loss figure for purposes of sentencing under § 2F1.1, however, "the loss need not be determined with precision." U.S.S.G. § 2F1.1, comment. (n.9). Rather,"[t]he court need only

11

make a reasonable estimate of the loss, given the available information." Id. We review a district court's finding as to the amount of loss attributable to criminal conduct for clear error. See United States v. Parsons, 109 F.3d 1002, 1004 (4th Cir. 1997).

In this case, the district court valued the loss attributable to Dizelos' conduct at $978,130.93, based upon a detailed report of loss compiled in connection with Dizelos' presentence report. Specifically, Dizelos was held accountable for two categories of losses. The first consisted of the loss to the owners of the stolen vehicles (approximately $28,599) and to the insurance companies for payments made to the owners (approximately $823,796). The second category of losses consisted of the amounts paid by the purchasers of replated vehicles from Dizelos' business ($603,898.24), minus the salvage amounts recovered when the vehicles were sold at auction ($478,163.17). Finding that the loss calculations were "very detailed, clearly supported, very precise," the district court adopted the presentence report calculations. J.A. 223. Dizelos, however, claimed error in the calculation on a number of grounds, the end result of which, he contends, would place the total loss at less than $120,000 and, consequently, the offense level increase at six instead of eleven. See U.S.S.G. § 2F1.1(b)(1)(G).

With regard to the first category of loss, Dizelos asserts that he should not be held accountable for the $823,796 paid by the insurance companies to the victims of the initial automobile thefts because, while the evidence supported a finding that Dizelos obtained stolen vehicles, there was insufficient, reliable evidence to directly connect Dizelos to the actual thefts of the vehicles. Alternatively, Dizelos asserts that he was improperly held responsible for five of these stolen vehicles, valued at $50,000, because only parts from the vehicles were recovered and that the amounts paid to insurance companies improperly included other incidental losses associated with the thefts, such as storage charges, towing fees, and personal property.

With regard to the second category of loss, Dizelos complains that he was given an insufficient "credit" for the resale of the vehicles sold at auction because the amount recovered was less than fair market value. In other words, Dizelos claims that he was entitled to an undetermined larger credit against the loss figure measured by the amount

12

that the dealerships paid for the replated vehicles because, by selling at an auto auction instead of at retail, the dealerships recouped less than they could have for the replated vehicles. And finally, Dizelos asserts that the loss figure improperly included $40,000 in sales taxes incurred by customers who purchased the replated vehicles because the consumers could have obtained a refund.

Having considered the totality of the evidence presented, as well as the detailed loss figures ascertained for Dizelos' presentence report, we cannot say that the district court clearly erred in valuing the loss attributable to Dizelos for his chop-shop activities, particularly given § 2F1.1's provision that "the loss need not be determined with precision," but rather need only be a "reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.9). As noted by the district court, the conspiracy for which Dizelos was convicted involved an elaborate scheme that lasted for at least several months, and which involved sixty-seven known stolen vehicles. With regard to Dizelos' specific challenges, we, like the district court, find no merit to Dizelos' invitation to separate the act of vehicle theft from the conspiracy for which he was convicted. The indictment specifically charged that, in operating the chop-shop, Dizelos and his co-conspirators obtained stolen cars for the purpose of replating them with VIN numbers from salvage vehicles obtained at low prices. Indeed, the lifeline of the conspiracy was the stolen vehicles. And, we also reject Dizelos' contention that his possession of mere "parts" from a stolen vehicle should be insufficient to hold him accountable for the loss associated with the stolen vehicle itself. After all, Dizelos was convicted of a conspiracy to use stolen and salvage vehicles to operate a chop-shop and, given the other evidence presented, we can hardly conceive of a more reasonable inference than that the stolen car, to which the parts belonged, passed through Dizelos' chop-shop on the way to a dealership.

Finally, we are likewise unconvinced that the district court committed clear error in attributing $125,000 in dealer losses to Dizelos, which were associated with the second stage of Dizelos' conspiracy. And, because the remaining losses would exceed $800,000 in any event, the eleven-level enhancement was properly applied and Dizelos is not entitled to a reduction in his total offense level. See U.S.S.G. § 2F1.1.

13

B.

Dizelos' final challenge is to the district court's imposition of a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), for his participation as an "organizer or leader" of an "otherwise extensive" criminal activity. U.S.S.G. § 3B1.1(a). We review the district court's determination for clear error. See United States v. Perkins, 108 F.3d 512, 518 (4th Cir. 1997).

Section 3B1.1(a) of the Sentencing Guidelines provides for a four-level enhancement, based upon a defendant's aggravating role in the offense, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Dizelos, whom the trial court determined fit this description, challenges the enhancement because it was supported in part by the testimony of a law enforcement officer who testified as to the results of the interviews of two of Dizelos' coconspirators, both of whom had entered into cooperation agreements with the Government.

We find no error in the district court's application of a four-level enhancement for Dizelos' role in the offense. When making sentencing determinations, the district court may consider any reliable and relevant information, including hearsay. See United States v. Jones, 31 F.3d 1304, 1316 (4th Cir. 1994); United States v. Bowman, 926 F.2d 380, 381 (4th Cir. 1991). Furthermore, the district court did not rely solely upon the challenged statements. Rather, the court was also presented with voluminous evidence which corroborated the statements and which more than supported a finding that Dizelos was a leader and organizer of the criminal activity.

IV.

For the foregoing reasons, we affirm the convictions and sentences imposed upon Theodore Dizelos.

AFFIRMED

14