PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                    No. 01-5002

STEPHANIE MOHR,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-00-453)

Argued: December 6, 2002

Decided: February 3, 2003

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
James P. JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Chief Judge Wilkinson and Judge Jones joined.

## COUNSEL

**ARGUED:** Fred Warren Bennett, BENNETT & NATHANS, L.L.P.,
Greenbelt, Maryland, for Appellant. Steven Michael Dettelbach,
Assistant United States Attorney, Greenbelt, Maryland, for Appellee.
**ON BRIEF:** Booth M. Ripke, BENNETT & NATHANS, L.L.P.,
Greenbelt, Maryland, for Appellant. Thomas M. DiBiagio, United

States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland; Ralph F. Boyd, Jr., Assistant Attorney General, Jessica Dunsay Silver, Gregory B. Friel, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Stephanie Mohr, a Prince George's County, Maryland police officer, of unlawfully releasing her police dog in violation of 18 U.S.C.A. § 242 (West 2000). On appeal, Mohr challenges evidentiary rulings in which the district court (1) admitted testimony of subsequent incidents of intentional misuse of a police dog by Mohr; (2) permitted a government expert to testify on prevailing practices for use of a police dog; and (3) admitted a witness's prior consistent statement and allowed him to explain his reason for making that statement.[1] We affirm.

### I.

On September 21, 1995, Officer Wendell Brantley, of the Takoma Park, Maryland Police Department, was conducting surveillance in the Holton Lane area of Prince George's County because of a number of commercial burglaries in that area. At approximately 2 a.m., Officer Brantley spotted two men on the roof of the Sligo Press building. He called for assistance and several Takoma Park officers, including

---

[1]Mohr also claims ineffective assistance of counsel because the lawyer who represented her before the district court filed one pre-trial motion late. A claim of ineffective assistance of counsel should be raised through a motion under 28 U.S.C. § 2255 (West 1994 & Supp. 2002) rather than on direct appeal, "unless it 'conclusively appears' from the record that defense counsel did not provide effective representation." *United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999) (citation omitted). Here, it does not "conclusively appear" from the record that Mohr received ineffective assistance of counsel. Accordingly, we do not consider the claim on this direct appeal.

Sergeant Dennis Bonn, responded. Bonn then asked for assistance from Prince George's County and specifically requested a K-9 dog. Prince George's K-9 officers Mohr and Anthony Delozier arrived with Mohr's police dog. Bonn also called for a Maryland State Police helicopter, which illuminated the entire roof with a powerful light called a "night sun."

Bonn, with corroboration from three other police eyewitnesses, testified to the government's version of how and why Mohr released her police dog on Ricardo Mendez, one of the suspects on the roof. After the helicopter arrived, the officers ordered the suspects to come to the back of the roof. Mendez and the other suspect, Jorge Herrera-Cruz, did so and held their hands in the air, as directed by the officers. Then, again as directed by the officers, the suspects climbed down from the roof, keeping their hands in the air, and eventually facing the officers, who surrounded them in a semicircle, some with their guns drawn. Bonn testified that the suspects followed all police commands.

As the suspects stood with their hands up in the air, Delozier approached Bonn and asked: "Sarge, can the dog get a bite?" Bonn "responded with one word, which was yes." Bonn testified that "[a]t that time, [the suspects] still had their hands in the air and they weren't doing anything." Bonn then witnessed Delozier and Mohr have "a very, very brief exchange," followed by Mohr releasing the dog. The dog attacked Mendez, who "still had his hands in the air when . . . the dog bit him in the leg. [He] went down screaming and continued to scream." Bonn testified that, prior to Mohr's release of the dog, Mendez did not make "any sudden movement," did not "fail to comply with police command[s]," did not "lower his hands," and did not "attempt to flee in any way." Bonn did not hear any K-9 warning prior to Mohr's release of the dog or at any point during the evening.[2] As a result of the incident, Bonn pled guilty as an accessory-after-the-fact to a civil rights violation and testified for the government pursuant to a plea agreement.

---

[2]A K-9 warning is a "loud verbal" announcement made prior to release of the dog, which allows "innocent persons to exit the area and afford[s] suspects an opportunity to surrender." *Vathekan v. Prince George's County*, 154 F.3d 173, 176 (4th Cir. 1998).

Mohr took the stand and offered a very different version of the events. She testified that she gave a K-9 warning while Mendez and Herrera-Cruz were on the roof. Mohr further testified that Mendez did not follow her orders to stop when he climbed down from the roof, and that he did not raise his hands: "Mr. Mendez's hands never went up. He had them in the front of his body, around his waistband area. Sometimes I could see his hands and sometimes they went out of my sight in front of his body. There [were] times that I couldn't see his hands, and I was ordering him — I was issuing him command after command to raise his hands, and he didn't." Mohr did not believe that either suspect had been frisked. She then observed Mendez "turn his body and his feet to the left and make a movement to the left, [and] as soon as [she] saw him do that, it meant to [her] that he was going to run to the left" and "attempt to flee" toward an avenue of escape where she believed there were no officers. Mohr explained that she did not have time to give her usual K-9 warning but yelled to Mendez to stop. She then released the dog. Mohr testified that Delozier did not speak to her prior to releasing the dog and that she alone made the decision to do so. Mohr acknowledges that Mendez suffered "at least one serious dog bite."

It was subsequently discovered that Mendez and Herrera-Cruz were homeless and were simply sleeping on the roof. The parties stipulated that the Takoma Park Police Department charged both men with burglary in the fourth degree. Charges against Mendez were subsequently dismissed. Herrera-Cruz was jailed for 60 days, appeared in court without an attorney and pled guilty; he was sentenced to time served.

On September 20, 2000, a federal grand jury returned an indictment charging Mohr and Delozier with violating 18 U.S.C.A. § 242 (West 2000), by acting under color of law to willfully deprive Mendez of his right to be free from the use of unreasonable force. Mohr and Delozier were also charged with a conspiracy, in violation of 18 U.S.C.A. § 371 (West 2000). A jury trial was held from February 26 through March 14, 2001. The jury acquitted Mohr of conspiracy and Delozier of the § 242 offense. Because the jury could not reach a verdict on the § 242 charge against Mohr and the conspiracy charge against Delozier, the trial court declared a mistrial on those two counts. A second trial commenced on July 31, 2001. Two weeks

later, the jury returned a guilty verdict against Mohr on the § 242 charge and acquitted Delozier on the conspiracy charge. The district court subsequently sentenced Mohr to 120 months imprisonment.

## II.

Mohr first and principally contends that the district court erred in admitting, pursuant to Federal Rule of Evidence 404(b), evidence of two subsequent acts of her intentional misuse of a police dog.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but may be admissible for "other purposes, such as proof of . . . intent." The rule "is understood as a rule of inclusion," *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997), and covers evidence of both prior and subsequent acts. *See United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than prior act is of no moment."); *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982) ("[S]ubsequent conduct may be highly probative of prior intent.").

A court weighs the admissibility of Rule 404(b) evidence in a four-part test. *Queen*, 132 F.3d at 997. The evidence must be (1) relevant to an issue, such as an element of the offense; (2) necessary "in the sense that it is probative of an essential claim or an element of the offense"; (3) reliable; and (4) admissible under Federal Rule of Evidence 403, in that its prejudicial nature does not "substantially outweigh[ ]" its probative value. *Id.* Rule 403 requires exclusion of evidence "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995) (internal quotation marks omitted).

We review the district court's decision as to admissibility of evidence for an abuse of discretion, and will not find an abuse unless a decision was "arbitrary and irrational." *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002). We afford the district court wide dis-

cretion in "determining whether evidence is unduly prejudicial." *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996).

A.

The first evidence of Mohr's misuse of a police dog involved her release of a police dog on Kheenan Sneed, a 16-year-old African-American boy. Sneed, his mother, and Mohr all testified about the incident.

Their testimony revealed that on the evening of August 3, 1997, Mohr and her police dog tracked a possible suspect who had run from police after committing a commercial burglary in Oxon Hill, Maryland. In a nearby residential neighborhood, Sneed slept in a neighbor's backyard hammock. Sneed was awakened by a dog biting his leg and pulling him out of the hammock, and a female officer striking him in the back of his head and on his right shoulder with a flashlight or baton. The dog remained on Sneed's leg after he was handcuffed. Sneed urinated on himself while the dog bit him. He testified that he did not hear any type of K-9 warning prior to the dog bite. Sneed also testified that he never tried to run away from the officer, never threatened her, and never resisted in any way. He was not charged as a result of the incident.

Mohr testified that she believed Sneed was the suspect based on her dog's track of the suspect's scent. When she saw Sneed in the hammock, she gave two K-9 warnings, received no response, and then released the dog. She testified that Sneed struggled with the dog and attempted to injure him, so she struck Sneed with her flashlight to keep him from injuring the dog. When another officer then told her that Sneed might not be the suspect, Mohr took the dog "off right away and backed off."

Mohr does not contest the reliability of the evidence relating to the Sneed incident. Moreover, the incident was certainly relevant; both the Sneed incident and the incident at issue in the instant case involved Mohr's unreasonable release of her police dog. *See Queen*, 132 F.3d at 997 ("[T]he more similar the prior act is . . . to the act being proved, the more relevant it becomes."). In fact, in her appellate brief, Mohr recognizes the relevance of the Sneed evidence, arguing

(in support of her contention that its admission unfairly prejudiced her) that the Sneed incident "bears . . . close similarity to the situation involved in this case."

Mohr does, however, strongly challenge the necessity of this evidence. The government maintains that it was necessary to prove an element of the § 242 offense, namely Mohr's willful release of her police dog on Mendez. In this case, to demonstrate a violation of § 242, the government had to establish, *inter alia*, that Mohr acted (1) willfully, that is with "the particular purpose of violating a protected right made definite by the rule of law" or "recklessly disregard-[ing] the risk" that she would do so (2) under color of law, (3) to deprive Mendez of a right protected by the Constitution of the United States. *United States v. Johnstone*, 107 F.3d 200, 210 (3d Cir. 1997) (interpreting *Screws v. United States*, 325 U.S. 91 (1945)); *see United States v. Brown*, 250 F.3d 580, 584 (7th Cir. 2001); *United States v. Cobb*, 905 F.2d 784, 787 (4th Cir. 1990). Thus, the government clearly bore the burden of proving, beyond a reasonable doubt, that Mohr released her dog, *willfully intending* to deprive Mendez of his constitutional right to be free of excessive force. Evidence of Mohr's release of her police dog on Sneed was probative of willfulness because it suggested that, on at least one other occasion, Mohr used her police dog in a way that recklessly disregarded the risk that her actions would violate a citizen's right to be free from the use of excessive force.

Nevertheless, Mohr argues that evidence of the Sneed incident was not necessary to establish her willful intent because the government had "a mass of [other] evidence" of intent, including testimony as to: the suspects' surrender before Mohr released the dog, the blatant impropriety of Delozier's request that Bonn allow the dog "to get a bite," prevailing practices on use of police dogs, and Mohr's alleged efforts to lie and cover-up any wrongdoing.[3] The problem with this argument is that Mohr specifically disputed her intent at trial. She her-

---

[3]Mohr also argues that she confessed at trial that she "intentionally released her dog." This argument misapprehends the specific intent requirement of § 242. She only testified that she made the decision to release the dog rather than doing so at Delozier's request. She certainly did not confess that she *willfully* released the dog on Mendez.

self testified that she released the dog on Mendez based on her training and her view that it was reasonable and justified given her perception that Mendez was attempting to flee. In light of the government's heavy burden of proving, beyond a reasonable doubt, that Mohr released her dog on Mendez with the "particular purpose" of violating or in "reckless[ ] disregard" of Mendez's right to be free from unreasonable force, the district court clearly did not abuse its discretion in finding the Sneed incident evidence necessary.

Mohr's final contention with respect to the Sneed evidence is that, even if relevant, reliable, and necessary, it should have been suppressed under Rule 403 because it unfairly prejudiced her by "paint[ing]" her as a "racist" white police officer, releasing her "attack dog" on a "defenseless African-American child." Actually, we believe that the potency of this evidence lay in its graphic demonstration that Mohr unreasonably released her police dog on an innocent, clearly unresisting young person — regardless of the race or sex of that person. If believed, such evidence would, of course, severely damage Mohr's defense, but "[*u*]nfair prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 404.21[3][b] (Joseph M. McLaughlin, ed., 2d ed. 2002) (emphasis in original). Indeed, our adversarial system depends on opposing parties offering evidence that will strengthen their respective positions and damage that of their opponents.

Rather, Rule 403 only requires suppression of evidence that results in unfair prejudice — prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion, and only when that unfair prejudice "*substantially* outweigh[s] the probative value of the evidence." *Id.* (emphasis in original); *see also United States v. Grimmond*, 137 F.3d 832, 833 (4th Cir. 1998). In this case it does not seem to us that any unfair prejudice resulted from the fact that Sneed happened to be an African-American and that the government noted his race in its opening statement. And, in any event, any possible unfair prejudice certainly did not "substantially outweigh" the probative value of the Sneed evidence.

This is especially so given the instructions provided the jury by the district court. The court explained that "Mohr [was] not on trial for

committing any act not alleged in the indictment," and that evidence of other bad acts may not be used as "a substitute for proof that she committed the crime charged" or as proof of "criminal personality or bad character" but rather was only relevant in determining if Mohr acted "knowingly and intentionally" and not because of "mistake, accident or other innocent reason." Such a careful limiting instruction significantly ameliorated any possible unfair prejudice here. *See Powers*, 59 F.3d at 1468 (noting that "cautionary or limiting instructions generally obviate" prejudice).

B.

Mohr also contends that the district court abused its discretion in admitting testimony regarding her threat to release her police dog on Jocilyn Hairston's "black ass" if Hairston lied about the whereabouts of her fugitive brother. Hairston, her mother, and Mohr testified about the incident.

In July 1998, Hairston, an African-American woman about thirty-seven years old, and her mother lived in Capitol Heights, Maryland. One evening, some time after 11:30 p.m, three officers arrived at Hairston's home looking for her brother, who had violated his probation in California. Mohr, accompanied by a police dog, was one of these officers. After the officers learned from Hairston that her brother was not there, one of the male officers asked if they could search the house; Hairston replied "sure." While they searched, Mohr and the dog remained on the top step of the stoop and Hairston stood in the doorway of the house. Hairston asked Mohr if she could move because she was "scared of the dog," who was jumping up. Mohr said no. Hairston testified that Mohr then said: "I'm going to let him in. He's going to bite your black ass and your brother if I find out he's in there." Mohr's tone of voice and demeanor were "nasty" when she "said the comment about the black ass."

In her testimony, Hairston's mother identified Mohr as the officer with the dog and confirmed her daughter's testimony regarding the "black ass" comment. Mohr testified that she did not recognize Hairston or her mother and that she had only a "vague recollection of the call for service, but . . . nothing stuck out from that call."

We again apply the four factors for admissibility of evidence under Rule 404(b). As with the Sneed evidence, Mohr does not contest the reliability of the Hairston evidence. With regard to relevance, she argues that the Hairston incident and the release of the dog on Mendez are not sufficiently similar because Mohr never released her dog on Hairston. But the purpose of the 404(b) evidence in this case was to establish that Mohr possessed the requisite state of mind — willfulness — when she released her dog on Mendez. Mohr's threat to release her dog on an unresisting, innocent citizen goes to that essential question of willfulness, regardless of whether she actually released the dog. *See Queen*, 132 F.3d at 996 ("[S]imilarity may be demonstrated through physical similarity of the acts or through the defendant's indulging [her]self in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.") (internal quotation marks omitted)). Thus, the evidence was relevant. We also conclude, for the reasons discussed with regard to the Sneed incident, that evidence of the Hairston incident was necessary and not unfairly prejudicial.

We do address, however, one specific argument that Mohr raises as to the asserted prejudicial nature of the Hairston evidence. Mohr contends that, even if the district court properly found the evidence admissible, the court should have redacted any reference to Hairston's "black ass" as "extremely prejudicial." Of course, a district court should, when possible, eliminate inflammatory language. In this instance, however, we agree with the district judge that the "black ass" portion of Mohr's threat cannot be reasonably separated from the threat itself.[4]

---

[4]We also reject Mohr's contention that the government's connection in its opening statement between the "black ass" comment and "how Stephanie Mohr's mind works" pertained to alleged racism by Mohr and was, therefore, unfairly prejudicial. It is clear from the context that the government intended to draw a connection for the jury between Mohr's unjustified threat to release the dog on Hairston and her willful release of the dog on Mendez. Thus, the prosecutor stated, "there is going to be additional evidence that this was no mistake or no accident on the part of Officer Mohr that night. . . . [Y]ou're going to hear about another incident that speaks volumes about Officer Stephanie Mohr's state of mind, about how she thinks and what she was thinking on that night . . . . And

Without that phrase, Mohr could argue that Hairston misunderstood her or that she merely issued a legitimate warning. Indeed, in her appellate brief, Mohr argues precisely this: "[A]ll Ms. Mohr did — sans the alleged racism — was warn that she would release the dog if and only if it were established that the residents were lying to police, that they were harboring a known fugitive who was suspected of armed bank robbery." The "black ass" portion of Mohr's remark could not be redacted from the remainder of it without changing the meaning of that remark. Therefore, the district court did not abuse its discretion in not redacting it.

C.

Mohr makes two additional general challenges to the 404(b) evidence that require brief discussion. She maintains that after the government failed to obtain her conviction for violation of § 242 at the first trial, it decided to "play the race card" to "improperly inflame the passions of the jury" by seeking admission of evidence of bad acts involving African-Americans, which had not been part of its case at the first trial, and that the district court improperly acceded to the government's request and allowed "irrelevant references to racism to infect the trial." Mohr also contends that the district court admitted "too much" Rule 404(b) evidence. The record provides no support for either argument.

Prior to the second trial, the government did file a written motion to admit evidence, which had not been admitted at the first trial, of

---

then she says if your brother is here, I'm going to put the dog on him, and I'm going to put the dog on your black ass, too. . . . That is how Stephanie Mohr's mind works. That's how you know that what happened in the back of Sligo Press on September 21st, 1995 was no accident. It was no mistake." We also do not find that Mohr's question to Hairston, "[I]s that what *you people* do for a living, waving guns in people's face[s]," was unfairly prejudicial, especially in light of the fact that Hairston responded in a way that interpreted the "you people" as a reference to her family rather than to a racial group. Hairston testified that she responded that both she and her mother worked and that "[i]f [her] brother choose[s] to make a mistake . . . it doesn't reflect on [her] or [her] family."

six Rule 404(b) incidents in which Mohr "intentionally made improper use of her police canine." But the government offered an entirely legitimate justification for this request — this evidence was necessary to prove wrongful willfulness in Mohr's handling of the K-9 with respect to Mendez, because, at the first trial, Mohr had offered the defense that release of the dog on Mendez was reasonable under the circumstances and done without criminal intent. Although opposing the government's motion, Mohr acknowledged in her opposition that the "[g]overnment correctly asserts that defendant Mohr raised the issues of reasonableness and lack of criminal intent in the first trial and *will likely do so in the next*." After consideration of these arguments, the experienced district judge, who had also presided over the first trial, found that "based on the first trial, . . . there is a necessity for the [g]overnment to utilize similar incident evidence in order to demonstrate intent" given the "very big dispute as to the circumstances under which" Mohr made the decision to release the dog. As we have already held, the district court certainly did not abuse its discretion in so holding. Furthermore, that the other similar incidents in some way involved African-Americans does not make the government guilty of "playing the race card."

Perhaps more importantly, the district court's careful treatment of this evidence eliminated the possibility of such a strategy even if that had been the government's intent. After examining written materials relating to the six proffered incidents and conducting a pre-trial hearing, the district court permitted the government to introduce evidence of only two of the six incidents — the Sneed and Hairston incidents — and reserved ruling on a third incident, which the government did not subsequently seek to admit. The Sneed evidence did not demonstrate racism on Mohr's part, just willfulness. A portion of the Hairston evidence did suggest racism but that portion could not be eliminated without depriving the Hairston evidence of its probativeness. In any event, that testimony did not "infect" the trial. Rather, during the eleven-day trial, only two witnesses briefly testified for the government about each of the incidents, and Officer Mohr testified in her own defense and provided the jury with her version of the incidents. Moreover, as noted within, the district court carefully instructed the jury as to the limited relevance of this evidence. Given this record, we cannot conclude that the district judge admitted "too much"

Rule 404(b) evidence or allowed the prosecution to inflame the jury with unnecessary evidence of Mohr's alleged racism.

### III.

Mohr also asserts that the testimony of the government's rebuttal expert exceeded that allowed under the Federal Rules of Evidence. Although the government maintains that we should review Mohr's challenge to certain aspects of the expert testimony for plain error, we believe that Mohr adequately preserved all of her objections to the expert testimony. Accordingly, we review the district court's decisions with respect to admission of the expert testimony for abuse of discretion. *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995).

### A.

Paul Mazzei, Mohr's basic training officer, now the owner of a law enforcement training and consulting group and the deputy director of the Prince George's Municipal Police Academy, testified as the first defense witness. He recounted what he had taught Mohr about the "use of force continuum and reasonable force and police safety." He explained that use of a K-9 would be considered "less lethal force" and "would fall in the same area" as "an intermediate weapon," such as a baton.

Mazzei also testified about Mohr's training as to specific arrest scenarios. For example, an evening burglary in progress at a commercial location was to be considered "a very high-risk situation," in which a suspect's failure to comply with commands "increases the risk," and a suspect's waistband area "is one of the highest risk areas where individuals could secrete firearms." She was further taught that when a suspect, "in a moderate-to-high-risk situation," drops his hands to the area of the waistband, it is an "extremely hazardous time" and officers must "evaluate the situation and take control as quickly as possible with the level of force that would be most reasonable to do so." Throughout his testimony, Mazzei used the terms "reasonable" and "totality of the circumstances" and discussed a "reasonable" use of force. Mohr then testified in her own defense and provided the

details of her K-9 training, including the view that a K-9 is one level below lethal force or use of a firearm.

James Fyfe, a New York City police officer for sixteen years and now a professor of criminal justice and use-of-force consultant to police departments, testified for the government in rebuttal. Like Mazzei, Fyfe placed a K-9 on the use of force continuum, but he put a K-9 "just below deadly force" and above an impact weapon. He opined that, based on Mohr's trial testimony, her release of the K-9 "was not in accord with prevailing police practices in 1995." His opinion was based on "tak[ing] into account the totality of the circumstances and the idea that police should use no more force than is necessary, reasonably necessary, in the totality of the circumstances." Fyfe then discussed a number of the factors in Mohr's version of events and concluded that "in those circumstances, it seems to me that the use of the dog on such a quick movement was inappropriate because there were less drastic ways of apprehending these folks . . . who had given no indication that they were armed in any way." He further explained: "[W]here you're facing a potential foot race between the dog and a human being, you have plenty of time to give the warning because the dog is certainly going to outrun the human being and apprehend him. So I don't think this was a split-second decision. . . . [T]here's no reason why you can't give a [K-9] warning like that and still have plenty of time for the dog to apprehend the individual."

## B.

Mohr acknowledges that Federal Rule of Evidence 704 permits expert testimony "that embraces an ultimate issue to be decided by a trier of fact" if the testimony is "otherwise admissible," Fed. R. Evid. 704(a), but she contends that Fyfe's testimony was not "otherwise admissible" because it did not assist the jury, as required by Federal Rule of Evidence 702, and because it exceeded the scope of proper rebuttal. Our decision in *Kopf v. Skyrm*, 993 F.2d 374 (4th Cir. 1993), given the record in this case, forecloses Mohr's challenges to Fyfe's testimony. In *Kopf*, a § 1983 excessive force action, we reversed the district court's exclusion of expert testimony that an officer's use of

his police dog was "unreasonable and "violated accepted police practices." *Id.* at 378.[5]

Mohr suggests that *Kopf* only resolves the question of whether *any* expert testimony on use of police dogs is permissible; she acknowledges the admissibility of Fyfe's testimony as to "where a K-9 falls on the use of force continuum" but insists that, notwithstanding *Kopf*, much of Fyfe's remaining testimony was inadmissible because it "impermissibly told the jury what decision to reach." Specifically, Mohr challenges Fyfe's testimony that: (1) Mohr violated "prevailing police practices nationwide in 1995"; (2) a police officer should use no more force than "reasonably necessary, in the totality of the circumstances"; (3) Mohr's release of the dog was "inappropriate"; (4) Mohr had "plenty of time to give [a K-9 warning]"; and (5) there was "no reason" not to give a warning. Mohr contends Fyfe's "prevailing police practices" opinion was not proper rebuttal and that none of these opinions assisted the jury, which needed no expert to aid it in resolving the common sense issue of what is reasonable force.

Mohr reads *Kopf* too narrowly. In *Kopf*, we specifically rejected the contention that expert testimony of the sort Mohr challenges would not properly assist a jury. We noted that Rule 702 permits an expert witness to testify "in the form of an opinion or otherwise" if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." 993 F.3d at 377 (quoting Fed. R. Evid. 702). We explained that an "objective reasonableness" test like that used to determine the reasonableness of force "implies the existence of a standard of conduct," and where that standard is defined, not by a reasonable person, but by a reasonable officer, "it is more likely that Rule 702's line between common and specialized knowledge has been crossed." *Id.* at 378.

Although we held that the facts of every case, especially the type of force involved, would determine whether expert testimony could

---

[5]"Because 18 U.S.C. § 242 is merely the criminal analog of 42 U.S.C. § 1983, and because Congress intended both statutes to apply similarly in similar situations, our civil precedents are equally persuasive in this criminal context." *United States v. Cobb*, 905 F.2d 784, 788 n.6 (4th Cir. 1990).

assist the jury, we specifically found expert testimony on police dogs admissible because the "train[ing] and use" of a police dog are "obscure skills." *Id.* at 379. We also did not foreclose the expert's testimony, under Rule 704(a), that the use of the police dog in that case was "unreasonable" and "violated accepted police practices." *Id.* at 378-79. Finally, we held that the district court abused its discretion in not permitting the expert to rebut testimony offered by the officer that his actions were reasonable because the purpose of a police dog is "to encounter a dangerous situation in lieu of officers," with the expert view that "the purpose of a police dog is to locate suspects, not to apprehend or bite them" and that, given the number of officers on the scene, it "was improper" for the officer to "permit the dog to bite and cause serious injury." *Id.* at 378.

In this case, Mazzei and Mohr testified extensively as to her training, their view of the K-9 and use of force, and the reasonableness of Mohr's release of her dog in light of the arrest factors. Given this testimony, the district court did not abuse its discretion in permitting the government to offer Fyfe's rebuttal testimony, which closely mirrored that discussed in *Kopf*. Specifically, the court did not abuse its discretion in allowing Fyfe to testify that Mohr's use of her police dog was "was not in accord with prevailing police practices in 1995" and to rebut the import of the combined testimony of Mohr and her training officer that her actions were both consistent with her training and reasonable based on the various factors surrounding the arrest.

## IV.

Finally, Mohr argues that Dennis Bonn, on redirect examination, should not have been permitted to (1) read to the jury a prior consistent statement that he made to the FBI because he had a pre-existing motive to lie and (2) explain his motivation for making that statement, namely his fear that he would fail an upcoming polygraph examination. Mohr contends that this testimony violated Federal Rule of Evidence 801(d)(1)(B), which permits a witness to testify to prior consistent statements as rebuttal to a charge "of recent fabrication or improper influence or motive."

## A.

During the government's investigation, Bonn initially gave inconsistent statements to the FBI and failed to mention his verbal assent

to Delozier's request that the dog "get a bite." However, Bonn ultimately admitted the exchange to the FBI in a short (twenty-nine line) written statement. Prior to trial, the government notified the defense and the district court that, depending on defense opening statements and cross-examination of Bonn, it might seek to elicit testimony on redirect about Bonn's motivation for making the admission in the written statement. The government proffered that Bonn would testify that he admitted his own involvement because he had acceded to the FBI request that he take a polygraph and believed that he would fail the polygraph unless he made the admission. In fact, Bonn *did not* ultimately take a polygraph examination.

On direct examination, the government did not question Bonn about the written statement or show it to the jury. Mohr's counsel, however, showed Bonn the written statement during cross-examination, questioned him about it, and quoted some of the statement to Bonn, asking him to verify that the statement was his language, that it was voluntary, and that Bonn had reviewed "every word" of the statement and signed it. Mohr's counsel also suggested improper motives for Bonn to fabricate the admission in the statement including (1) a provision in his plea agreement that shielded him from prosecution for another offense; (2) a 40-day delay in pleading guilty so that he would not face deferral of his pension benefits for 10 years; (3) being permitted to plead guilty to a lesser offense; and (4) the possibility of a downward departure for substantial assistance.

The district court permitted the government on redirect to ask Bonn to explain why he admitted his exchange with Delozier in the written statement. In doing so, the district court noted that the government provided "advance warning" about the issue in order to allow the defense to avoid it entirely, but that Mohr's counsel had "opened with the witness" the contents of the statement by showing it to him on cross-examination. On redirect, in response to the government's question as to why he made the admission, Bonn explained that he decided "to come clean" because he "knew the polygraph wasn't going to come up well." The government then had Bonn read the statement to the jury. On recross, Mohr's counsel elicited testimony from Bonn that, at the time he made the written statement, he knew polygraphs were not admissible in court, were "inherently unreliable," and that he made the decision not to take the polygraph. Mohr's counsel also elic-

ited that some portions of the written statement itself were inconsistent with Bonn's trial testimony.

### B.

Mohr maintains that Bonn's reading of his written statement to the jury and testimony about it on redirect violated Rule 801(d)(1)(B) because Bonn made the prior consistent statement *after* he had a motive to lie. The flaw in this argument is, as we explained in *United States v. Ellis*, 121 F.3d 908, 919 (4th Cir. 1997), that Rule 801(d)(1)(B) is not "the only possible avenue for admitting" prior consistent statements. Adoption of Rule 801(d)(1)(B) did not eliminate the admissibility of prior consistent statements under the Doctrine of Completeness, that is "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completion" is admissible. *Id.* at 921 (internal quotation marks omitted). In this case, the district court properly permitted Bonn to read his short statement to the jury during redirect because defense counsel had extensively cross-examined Bonn about the document and used a "portion" of it without permitting the jury to see it or Bonn to explain it. *Id.* Allowing Bonn to read the statement on redirect "averted" possible "misunderstanding or distortion." *Id.* As the district court noted, although the government provided "advance warning" about the issue in order to allow the defense to avoid it entirely, Mohr's counsel failed to heed the warning and instead "opened the door" by showing the statement to Bonn and cross-examining him about it.

Mohr also maintains that the district court abused its discretion, under Rule 403, in permitting Bonn to explain, on redirect examination, that concern over an impending polygraph examination caused him to make the written statement. Again, we agree with the district court that Mohr "opened the door" to Bonn's testimony on redirect by suggesting, in cross-examination, other improper motives for Bonn to make the statement, and thus the district court did not abuse its discretion in permitting the testimony. *See United States v. Williams*, 106 F.3d 1173, 1177 (4th Cir. 1997) (finding no abuse of discretion where district court permitted hearsay testimony on redirect examination

because defense opened the door through line of questioning in cross-examination).

## V.

This charged, notorious, highly publicized case requiring two full trials demanded good judgment and a steady hand from the district court. Our careful consideration of both the record and Mohr's appellate arguments persuade us that Mohr received precisely that. The judgment of the district court is in all respects

*AFFIRMED.*