**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4712

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

INTISAR KHALIF FARAH, a/k/a Intisar Ali,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonard D. Wexler, Senior District Judge, sitting by designation. (1:05-cr-00163-LDW)

Argued: May 25, 2007                Decided: August 14, 2007

Before WILKINSON, NIEMEYER, and GREGORY, Circuit Judges.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:** Melinda Laverne VanLowe, GREENSPUN, DAVIS & LEARY, P.C., Fairfax, Virginia, for Appellant. Jeanine Linehan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Peter D. Greenspun, GREENSPUN, DAVIS & LEARY, P.C., Fairfax, Virginia, for Appellant. Chuck Rosenberg, United States Attorney, Edmund Power, Assistant United States Attorney, Aaron M. Zebley, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Intisar Khalif Farah appeals her conviction for procuring naturalization unlawfully in violation of 18 U.S.C. § 1425(a). She assigns error to several of the district court's evidentiary rulings and rulings on her pre-trial and post-trial motions. For the reasons set forth below, we affirm.

I.

Farah, a native of Somalia, entered the United States for the first time on January 10, 1983, as a non-immigrant with a student visa. In May 1984, the Immigration and Naturalization Service ("INS") denied her application for an extension of stay and ordered her to depart the United States by July 13, 1984. Farah left for Mogadishu, Somalia, on July 10, 1984 and, later that summer, became engaged to marry Yusef Abdi Ali. At some point thereafter, Farah re-entered the United States, moving to Cape Giradeau, Missouri, in 1985 and to Alexandria, Virginia, in 1988.

On February 27, 1989, Farah applied for asylum. She stated in her application that January 11, 1983, was the date of her last arrival in the United States. She also stated that she and her family were members of the Isaaq clan and, as a result of that membership, she had been arrested three times, imprisoned, and tortured in Somalia. Her application was successful, and in December 1990, a year after receiving asylum, Farah applied for and

was granted lawful permanent resident status as an asylee eligible for adjustment.

On December 21, 1990, Farah requested refugee status in Canada, where her husband believed it would be easier for him to obtain asylum. In making her request, Farah claimed that she feared persecution in Somalia because she was "Isaac [sic] [and] the government kills all of our people." J.A. 1871. Farah claimed that she was arrested and imprisoned in Somalia in August 1989, fled Somalia in November 1990, and spent one month illegally in the United States en route to Canada. Farah further claimed that she was in Ethiopia from June 1988 to August 1989. Farah denied on two separate Canadian applications that she had ever applied for refugee status in any other country.

In June 1991, Farah appeared before the Canadian Immigration and Refugee Board and testified that she was Isaaq, that she was arrested in Somalia in May 1988 for participating in a protest against then-President Siad Barre, and that she went to Ethiopia after being released from prison but, upon her return to Mogadishu in August 1989, was arrested with other Isaaqs for being Isaaq. Farah testified that her boyfriend procured her release from prison and that she fled Somalia a year later for Canada, stopping first in the United States to meet her boyfriend. The Canadian government denied Farah's refugee application and ordered her to depart Canada by October 13, 1992. Farah returned to the United

States.  In July 1993, Farah's parents and siblings were admitted to the United States as refugees because Farah's father, a member of the Darod clan in Somalia, had been singled out for persecution as a high-ranking member of the former Somali government.

On April 20, 1995, Farah became a United States citizen.  She swore in her application for citizenship, and again during her interview with the INS, that her only absence from the United States since becoming a permanent resident was a visit to Canada from August 1991 to November 1991.  Farah stated that she was living in Virginia and working in the District of Columbia from 1990 to 1992.

In December 1996, Farah sponsored her husband's admission to the United States and, in March 1998, Farah submitted a declaration to the Executive Office of Immigration Review on behalf of her husband.  In that declaration, Farah provided details of her background which were inconsistent with the details she provided in her applications for asylum, adjustment of status, and naturalization.  Investigation into the affairs of Farah's husband provoked scrutiny of Farah's immigration file and, in December 1998, an INS official authored an internal memorandum identifying what the official considered false statements by Farah that were sufficient to denaturalize her.

On April 19, 2005, a grand jury indicted Farah for naturalization fraud.  Farah filed a motion to dismiss for failure

to return the indictment within the statute of limitations; the motion was denied after a hearing.  In August 2005, in response to a court order, the Government filed a bill of particulars enumerating the allegedly materially false statements Farah made in her applications for asylum, lawful permanent residence, and naturalization.  Farah then filed a renewed motion to dismiss for failure to return the indictment within the statute of limitations, a motion to dismiss for prejudicial pre-indictment delay and vindictive prosecution, and several motions in limine. After a hearing, the district court denied the motion to dismiss for prejudicial pre-indictment delay, stating that it would determine the issue during trial.  The court reserved its decision on the motion regarding the statute of limitations and the motions in limine.

At trial in November 2005, the Government presented documents from the INS, including a copy of Farah's 1984 plane ticket from the United States to Somalia, establishing that Farah left the United States for Mogadishu around July 1984 and returned to the United States sometime thereafter.  Additionally, the Government showed that Farah's declaration on behalf of her husband states that she is a member of the Darod clan although she based her claim for asylum on her membership in the Isaaq clan.  Accordingly, the Government presented evidence confirming that Farah and her immediate family are Darod, not Isaaq.  At the time Farah applied

for asylum, the Department of State considered members of the Isaaq clan to have a well-founded fear of persecution by Barre's regime and, consequently, a basis for being granted asylum in the United States. The Government therefore argued at trial that Farah knew a claim to have suffered mistreatment because she was Isaaq heightened her chances of being granted asylum. Also at trial, an INS officer testified that knowledge of Farah's false statements about her clan membership and her date of last entry into the United States would have resulted in the denial of her asylum application. Likewise, INS testimony established that if Farah had been truthful about living in Canada for approximately twenty-two months, rather than merely visiting Canada for three months, her extended absence from the United States would have rendered her ineligible to become a naturalized citizen. INS's knowledge that Farah obtained her lawful permanent resident status through fraud would have had the same consequence. An INS officer similarly testified that committing any fraud, generally, would have rendered Farah ineligible for adjustment of status.

The November 2005 trial ended in a hung jury. After a hearing conducted before the new trial, the district court denied Farah's renewed motion to dismiss for failure to return the indictment within the statute of limitations and reserved its decision on her motion to exclude the testimony of several Government witnesses. A second trial in March 2006 ended with a verdict of guilty. The

district court then denied all outstanding motions, including a motion by Farah for judgment of acquittal, and sentenced Farah to one month of incarceration and one year of supervised release. This appeal followed.

## II.

### *Statute of Limitations*

The district court denied Farah's renewed motion to dismiss for failure to return an indictment within the statute of limitations, finding that the indictment, dated April 19, 2005, was returned within ten years of the date Farah was naturalized, April 20, 1995. This Court reviews timely objections to an indictment de novo. United States v. Darby, 37 F.3d 1059, 1062-63 (4th Cir. 1994).

Farah does not dispute that the offense charged in the indictment, procuring naturalization unlawfully in violation of 18 U.S.C. § 1425(a), has a ten-year statute of limitations or that the one-day window the Government left itself in charging her is sufficient. Rather, Farah argues that the rule of lenity requires that the five-year statute of limitations for the offense of making a false statement in an immigration matter in violation of 18 U.S.C. § 1015 be applied to her case because the Government could have prosecuted her under that statute instead of under § 1425(a).

-8-

The rule of lenity provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." United States v. Bass, 404 U.S. 336, 348 (1971). Farah submits that the ambiguity in her case arises in Congress's failure to explain the disparity between the statute of limitation for § 1425(a) and that for § 1015. The rule of lenity, however, "serves as an aid for resolving an ambiguity; it is not to be used to beget one." Callanan v. United States, 364 U.S. 587, 596 (1961). Here, there is no ambiguity regarding the single statutory offense with which Farah is charged——violation of § 1425(a)——and the statute of limitations for that offense. See United States v. Helem, 186 F.3d 449, 455 (4th Cir. 1999) (stating that rule does not apply where statute is not ambiguous). For this reason, Farah's reliance on United States v. Head, 641 F.2d 174 (4th Cir. 1981), is misplaced. In Head, this Court applied the rule of lenity when a single conspiracy count charged the defendant with conspiracy to commit several different offenses with different statutes of limitations. Here, by contrast, there is no confusion among applicable offenses (only one is charged in the indictment) or applicable statutes of limitations (only one applies to the offense charged). The district court properly denied Farah's motion to dismiss.

*The 1998 INS Memorandum*

The district court denied Farah's request for production of the 1998 INS memorandum detailing the author's belief that Farah made false statements on immigration applications and that there were grounds to denaturalize her in an administrative proceeding. The Government had notified Farah that it would not produce the memorandum because the INS had marked it as confidential attorney work product, and had provided the court a copy of the memorandum for <u>in</u> <u>camera</u> inspection only. We review a district court's denial of discovery requests for abuse of discretion. <u>United States v. Fowler</u>, 932 F.2d 306, 311 (4th Cir. 1991).

As a rule, and pursuant to a discovery order entered in this case, any defendant may inspect items in the Government's possession that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). "A showing of materiality must include 'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" <u>United States v. Kirk</u>, No. 88-5095, 877 F.2d 61, 1989 WL 64139, at *2 (4th Cir. June 2, 1989) (unpublished) (quoting <u>United States v. Ross</u>, 511 F.2d 757, 762-63 (5th Cir. 1975), <u>cert denied</u>, 423 U.S. 836 (1975)).

Farah argues that, in denying her request for production, the district court improperly focused on whether the Government was going to use the memorandum at trial (the Government said that it

would not) and improperly relieved the Government of its burden to show that the memorandum actually constituted attorney work product. Cf. In re Grand Jury Proceedings, 102 F.3d 748, 750 (4th Cir. 1996) ("The work-product privilege protects the work done by an attorney in anticipation of litigation."). Farah also argues that the memorandum was relevant to her motion to dismiss the indictment for prejudicial pre-indictment delay and her ability to identify potential trial witnesses. By the time the court heard arguments on Farah's request for production, however, the Government had filed not only a bill of particulars but also more than one thousand pages of discovery in advance of both trials. Cf. Ross, 511 F.2d at 763 (stating that the "extensiveness of the material which the Government did produce and the availability of the disputed material from other sources, including the defendant's own knowledge, must also be considered" in determining materiality); United States v. Automated Med. Labs., Inc., 770 F.2d 399, 406 (4th Cir. 1985) (stating that the purpose a of bill of particulars "is to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial"). Given this evidence, it is not clear that the memorandum would have significantly altered the quantum of proof in Farah's favor. Because Farah cannot make the requisite showing, and because the Government did not intend to use the memorandum at trial and the memorandum is, on its face, attorney work product,

the district court did not abuse its substantial discretion to manage the discovery process by denying Farah's request.

### *Prejudicial Pre-Indictment Delay*

The district court denied Farah's motion to dismiss the indictment for prejudicial pre-indictment delay, in which Farah asserted that the Government's delay of up to seventeen years[*] in indicting her deprived her of testimonial and documentary evidence necessary to her defense.  We review timely objections to an indictment de novo.  <u>Darby</u>, 37 F.3d at 1062-63.

The Fifth Amendment's Due Process Clause requires dismissal of an indictment when a defendant establishes actual prejudice resulting from the Government's delay, and, after balancing the defendant's prejudice against the Government's justification for the delay, we find that "the [G]overnment's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" <u>Jones v. Angelone</u>, 94 F.3d 900, 904 (4th Cir. 1996) (citation omitted).  Two of Farah's examples of actual prejudice lack merit. First, Farah claims that her father, who died in 1996, could have offered credible, exculpatory testimony about Farah's clan

---

[*]Farah's repeated reference to a delay of ten-to-seventeen years is simply incredible, as any number over ten amounts to a claim that the Government failed to indict her even before the date she committed the charged offense, April 20, 1995.

identification. But Farah's father died two years before 1998, the year she argues she <u>should</u> have been indicted because the INS memorandum emerged that year. Even by Farah's timeline, her father never would have been available to testify. Second, Farah asserts that her conviction will have drastic immigration consequences for her family. But had Farah been indicted at precisely the same moment, yet acquitted, her family would suffer no immigration consequences. Thus, Farah's conviction is problematic for her family, not her delayed indictment.

Farah's other examples of actual prejudice have merit. First, Farah asserts that the delay made it difficult for her to verify that she was living and working in the United States and not Canada in 1991 and 1992——a major trial issue. Farah could not locate leases and bank records that could confirm her residence approximately fifteen years ago, and, in the last ten years, her former employer's business dissolved. Both her former employer and his accountant destroyed the records that could have verified her employment during 1991 and 1992, and her former employer could not independently recall her dates of employment. Second, Farah asserts that the delay made it difficult to unearth evidence that could support statements she made on her asylum application——also a major trial issue. Two of the immigration officials who testified at trial about Farah's 1989 asylum application could not

remember Farah, and her former immigration lawyer destroyed her asylum file.

These latter claims of prejudice are sincere, but describe problems—faded memories, lost evidence—that attend every case brought just barely within the statute of limitations. <u>Cf.</u> <u>United States v. Marion</u>, 404 U.S. 307, 326 (1971) (observing "the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost"). Nonetheless, we assume Farah has shown actual prejudice, and balance that prejudice against the Government's justification for its delay.

The Government, arguing that there was <u>no</u> delay, correctly notes that, although Farah maintains that the Government knew of her offenses in 1998 and should have indicted her then, the document on which she relies is an internal communication between attorneys at an agency with no authority to prosecute Farah. <u>See</u> 28 U.S.C. §§ 547(1),(2). The U.S. Attorney's Office, the only prosecuting authority for Farah's crime, first learned of Farah's crime in September 2004, just seven months before the indictment. Farah does not dispute this fact or argue that seven months constitutes an unreasonable delay. Nor, we note, does Farah allege nefarious motives on the Government's part. <u>See also</u> <u>Automated Med. Labs.</u>, 770 F.2d at 404 (considering it relevant, in declining to find a due process violation, that "there is no indication that

-14-

the Government intentionally delayed to gain some tactical advantage").

Having balanced the Government's position regarding its alleged delay against Farah's quite ordinary claims of prejudice, we cannot say that her indictment offends "fundamental conceptions" of justice, fair play, or decency.  Jones, 94 F.3d at 904.  We affirm the denial of Farah's motion to dismiss for prejudicial pre-indictment delay.


### *Exhibits 1-1 through 1-21*

Exhibits 1-1 through 1-21 are documents from Farah's immigration file, including her applications for asylum, lawful permanent residence, and naturalization, her green card and naturalization certificate, and communications sent to Farah by the INS.  Farah argues that the documents should have been excluded from evidence for a variety of reasons.  We review the district court's evidentiary rulings for abuse of discretion.  Gen. Elec. Co. v. Joiner,  522 U.S. 136, 141 (1997).

Farah's myriad protests fail.  The documents were kept in the course of regularly conducted business at the INS and are therefore admissible as business records.  Fed. R. Evid. 803(6).  Testimony established (and Farah's appellate brief admits) that Farah herself either inscribed directly or supplied indirectly much of the information in the documents, therefore many of the statements

-15-

within the documents are admissible as party admissions. Fed. R. Evid. 801(d)(2)(A). Finally, even if the stray markings by INS officials on the applications were nonverbal conduct intended as assertions and therefore "statements" under the Rules of Evidence, see Fed. R. Evid. 801(a), as Farah asserts, they fall within the business records exception to hearsay based on the testimony of two Government witnesses about the markings. In sum, the district court did not abuse its discretion in admitting Exhibits 1-1 through 1-21.

### Exhibits 7-1 through 7-9

The district court also did not abuse its discretion in admitting into evidence Exhibits 7-1 through 7-9, documents from Farah's Canadian immigration file. Farah argues that (1) the exhibits do not qualify as business records, and that (2) the Government impermissibly offered these exhibits to prove Farah's bad character (i.e., dishonest) or bad acts committed in conformity with her character (i.e., making false statements to immigration officials in the United States).

In challenging the admission of her Canadian immigration file as a business record, Farah raises many of the same, unavailing arguments she raised in challenging the admission of her INS immigration file. Her additional argument that the Canadian file is incomplete, preventing the court and the parties from knowing

whether critical information that would place the exhibits in a different light, lacks merit: whether the file qualifies as a business record does not depend on whether it includes every potentially relevant document. Her argument that the file contains an opinion and order issued by the Canadian Immigration and Refugee Board when, under Nipper v. Snipes, 7 F.3d 415 (4th Cir. 1993), court orders do not fall within the business records exception to the hearsay rule, is misplaced. Nipper actually holds that judicial findings of fact are not "public records" within the meaning of the public records exception to hearsay found in Federal Rule of Evidence 803(8)(C). 7 F.3d at 417. Neither party to this appeal invokes 803(8)(C) and, because the factual findings in the opinion and order were redacted, none remain about which to complain.

Farah's classification of Exhibits 7-1 through 7-9 as character evidence also fails. Under Rule 404(b) of the Federal Rules of Evidence, evidence of other crimes or wrongs "are admissible if they are (1) relevant to an issue other than character, (2) necessary, and (3) reliable." United States v. Rawle, 845 F.2d 1244, 1257 (4th Cir. 1988). Here, the Government introduced the Canadian immigration documents as circumstantial evidence that Farah lived in Canada in 1991 and 1992, and as evidence that Farah falsely stated on her application for naturalization in the United States that she had stayed in Canada

for less than six months.  Where, as here, evidence "is admitted as to acts intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, it is admissible." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996).  Even if, as Farah additionally claims, the Government referenced the exhibits in remarking on Farah's character during its closing argument, we cannot say that the district court abused its discretion in admitting Exhibits 7-1 through 7-9 as business records.

### Exhibits 2-1 through 2-6

The district court did not abuse its discretion in admitting Exhibits 2-1 through 2-6, documents from the immigration file of Farah's father.  The court admitted the documents under Federal Rule of Evidence 803(6), the business records exception to hearsay, and Rule 804(b)(4), the exception for statements of an unavailable declarant concerning the declarant's or a relative's personal or family history.  Under the latter rule, because Mr. Farah was unavailable at trial (he was deceased), his statements concerning his and his family's clan membership are excepted from the hearsay rule.  Farah's assertion that clan membership in Somalia is not as straight-forward and mechanical as facts concerning dates of birth, marriage, and the like allowed under Rule 804(b)(4) is not sufficient to disturb the district court's decision to admit Mr. Farah's statements under the rule.

Farah's final argument that the admission of Mr. Farah's file violates her rights under the Confrontation Clause is also unavailing. The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). Mr. Farah's statements were not testimonial because the "primary purpose" (any future purpose is irrelevant) of Mr. Farah's interrogation, liberally assuming his immigration interviews can even be called that, was not "to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 126 S. Ct. 2266, 2274 (2006). The primary purpose was to determine Mr. Farah's eligibility for an immigration benefit. Our highly deferential standard of review leads us to affirm the district court's decision here as well.

### *Authentication of Exhibits in Groups 1 and 2*

Farah asserts that Exhibits 1-1 through 1-21 and 2-1 through 2-6, documents from her and her father's immigration files were not properly authenticated because, according to Farah, the Government alleged only that she and her father signed the documents. The Government argues that for purposes of authentication, the documents were public records under Federal Rule of Evidence 901(b)(7) and did not require handwriting authentication. We

review decisions of the district court regarding authentication for abuse of discretion. United States v. Patterson, 277 F.3d 709, 713 (4th Cir).

The parties agree that, under Rule 901(a), the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). "To meet the threshold established by Rule 901(a), the party seeking to introduce physical evidence must provide a basis for the jury to resolve the authenticity question in favor of that party." Patterson, 277 F.3d at 713 (quotation marks omitted). Rule 901(b)(1) provides that a witness with knowledge may authenticate a piece of evidence by testifying that a matter is what it is claimed to be. A party need not rely on "nonexpert opinion as to the genuineness of handwriting" to authenticate or identify a document, so long as another method of conforming with Rule 901(a) is used.

Here, the INS record custodian had knowledge of documents kept by the INS and testified that the documents in the Farahs' files are what the Government claims. Cf. United States v. Hernandez-Herrera, 952 F.2d 342, 344 (10th Cir. 1991) ("We find that the testimony of Wheeler, an INS agent familiar with the record keeping practices of the INS regarding Exhibits 1-4, establishes the authenticity of these exhibits under Rule

901(b)(7).").   Further, contrary to what <u>Hernandez-Herrera</u> suggests, it is not necessary for the Government to invoke Rule 901(b)(7) for authentication; testimony pursuant to Rule 901(b)(1) sufficed.


### *The Expert Testimony of Dr. Lee Cassinelli*

The Government called Dr. Lee Cassinelli, a researcher of Somali culture, to establish that clan identity in Somalia is patrilineal and to elicit his opinion that, based on her father's clan identity, Farah is Darod, not Isaaq.  Farah argues that Dr. Cassinelli's testimony should have been excluded under Federal Rule of Evidence 702 because it was not reliable (he did not interview Farah, her family, or her friends), it did not aid the jury in determining a fact in issue (what Farah phrases as <u>her belief</u> about her clan identity), and it was generally more prejudicial than probative.  We review the district court's decisions regarding the admission of expert testimony for abuse of discretion.  <u>United States v. Mohr</u>, 318 F.3d 613, 622 (4th Cir. 2003).

"Unlike an ordinary witness, <u>see</u> Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  <u>Daubert v. Merrell Dow Pharma., Inc.</u>, 509 U.S. 579, 592 (1993).  Dr. Cassinelli, therefore, did not need personal knowledge of Farah's clan identity or a personal interview with Farah to opine about her

clan identity.  His testimony about Somali clan structure was relevant, a fact Farah concedes, and Farah had the opportunity on cross-examination to show the jury that, although Dr. Cassinelli believed he knew what clan Farah belongs to, there would be no way for him to know what clan she <u>believes</u> she belongs to. Accordingly, the district court did not abuse its discretion in admitting Dr. Cassinelli's expert testimony.

### *The Expert Testimony of Mary von Briesen, et al.*

Farah argues that the district court improperly allowed Mary von Briesen, Edward Newman, Michael Comfort, and Stanford Knight, all lay witnesses, to offer what amounted to expert testimony about the asylum, lawful permanent residence, or naturalization process.  We review for abuse of discretion. <u>United States v. Hassouneh</u>, 199 F.3d 175, 182 (4th Cir. 2000).

Federal Rule of Evidence 701 provides that a lay witness may express opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [on testimony by expert witnesses]." The rule "permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." <u>Certain Underwriters at Lloyd's, London v. Sinkovich</u>,

232 F.3d 200, 203 (4th Cir. 2000) (quotation marks and citations omitted).

Newman, Comfort, and Knight, former INS immigration examiners, and von Briesen, an officer at the Department of State, explained the requirements for obtaining asylum, lawful permanent resident status, or naturalization, and the applicant's duty to be truthful. The four witnesses expressed opinions based on relevant facts that they perceived in completing departmental functions. Their opinions about the consequences for an applicant who makes an untruthful statement on an application were based on firsthand knowledge of department protocol that is not overly technical or particularly specialized in nature. In addition, although the Government conceded that Comfort could be certified as an expert and that "it [was] certainly sufficient for someone with this man's amount of experience to say this is how they were trained, this is our procedure, this is the law, and this is why the statements are material," we cannot say that the district court abused its discretion in allowing Comfort, any more than it did von Briesen, Newman, and Knight, to testify as a lay witness rather than as an expert witness. J.A. 1252-53.

Farah additionally observes that Newman and Comfort did not process any of her immigration papers or interview her in conjunction with any of her immigration applications, and Knight reviewed her application but testified that he could not recall any

details about his review. Accordingly, Farah argues, their testimony as to what information is material in determining whether an immigration application should be granted was mere speculation as to the information that was actually material to the immigration officers who did review her applications and, therefore, their testimony was irrelevant and inadmissible. <u>See</u> Fed. R. Evid. 402. For the reasons just stated, we find this argument, too, unavailing. The district court did not abuse its discretion in allowing the testimony of von Briesen, Comfort, Newman, and Knight.

### *Motion for Judgment of Acquittal*

After the jury returned a guilty verdict, Farah unsuccessfully moved for judgment of acquittal. She argued that the Government presented several witnesses who lacked personal knowledge about her applications for asylum and naturalization, that it presented insufficient evidence to prove that she was not in the United States from January 1991 until October 1992, and that it never offered evidence about Farah's personal understanding of her clan identity or evidence to prove that Farah was not persecuted as she described. We review de novo a district court's denial of a motion for judgment of acquittal. <u>United States v. Smith</u>, 451 F.3d 209, 216 (4th Cir. 2006). We must "sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by 'substantial evidence.'" <u>Id.</u> (citation

omitted).  Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (citation omitted).

Viewing the evidence in the light most favorable to the Government, substantial evidence——much of it catalogued earlier in this opinion——supports the jury's guilty verdict.  The Government's case was not without its weaknesses, but the "jury, not the reviewing court," fills in the holes as it elects by "weigh[ing] the credibility of the evidence and resolv[ing] any conflicts in the evidence presented." Id. at 217 (citation omitted).  Moreover, even Farah concedes that she has provided "inconsistent statements" on her immigrations applications and the question is simply whether her statements were knowingly false as opposed to something more benign.  We sustain the district court's refusal to enter a judgment of acquittal.

### *Motion for a Mistrial*

Finally, Farah argues that two statements made by the Government during closing arguments required the district court to grant her motion for a mistrial.  Because the "denial of a defendant's motion for a mistrial is within the sound discretion of the district court," we will disturb such a denial "only under the

most extraordinary of circumstances." <u>United States v. Dorlouis</u>, 107 F.3d 248, 257 (4th Cir. 1997).

Farah first highlights the Government's remark that defense counsel had not offered a defense to Farah's alleged false statements and, instead, had merely "attack[ed] the government for taking the time" to investigate and indict Farah. J.A. 1725. Farah contends that this statement required a curative instruction, which the district court declined to give, because it improperly suggested to the jury that Farah had a burden to present a defense. Second, the Government surmised to the jury that if it had indicted Farah any earlier, she would have argued that the Government "rushed judgment." J.A. 1727. Farah contends that this statement led the jury to believe that the Government had been investigating her since the date of her crime, a suggestion she could not rebut because she could not use the 1998 INS memorandum at trial.

Our test to determine whether alleged incidents of prosecutorial misconduct warrant reversal asks first, whether the prosecutor's remarks or conduct was improper, and second, whether such remarks or conduct prejudicially "affected the defendant's substantial rights so as to deprive [her] of a fair trial." <u>United States v. Stockton</u>, 349 F.3d 755, 762 (4th Cir. 2003) (citation omitted). Under this test, the Government's statements, taken as a whole, were merely argumentative—in the fashion of closing arguments—and therefore not improper. Further, the statements did

not deprive Farah of a fair trial because the district court adequately instructed the jury that the burden of proof remained with the Government and that closing arguments are not evidence. On these facts, no mistrial was warranted.

### III.

For the foregoing reasons, we affirm the rulings of the district court.

<u>AFFIRMED</u>